JOHN HUBBLE and NANCY HUBBLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hubble v. Commissioner
Docket No. 1009-78.
United States Tax Court
T.C. Memo 1981-625; 1981 Tax Ct. Memo LEXIS 120; 42 T.C.M. (CCH) 1537; T.C.M. (RIA) 81625; October 26, 1981. *120 Held, petitioners failed to prove that a debt became wholly worthless in 1974 and petitioners were not entitled to a bad debt deduction under sec. 166(a)(1), I.R.C. 1954, for 1974. J. Fred Cohen, for the petitioners. Daniel J. Wiles, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioner's 1974 Federal income tax in the amount of $ 56,119.80. The sole issue for decision is whether petitioners are entitled to a business bad debt deduction under section 166(a)(1)[1] for the taxable year 1974. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners John Hubble and Nancy Hubble (sometimes hereinafter referred to collectively as petitioners), husband and wife, resided in Baltimore, Md., at the time of filing the petition herein. Petitioners filed their joint Federal income tax return for the taxable year 1974 with the Internal *121 Revenue Service, Philadelphia, Pa.
In 1970, petitioner John Hubble (hereinafter Hubble) was elected to a 6-year term as Clerk of the Circuit Court No. 2 of Baltimore. He held this position until 1976. As clerk, he received a salary of $ 20,416.66 for the taxable year 1974, and of approximately $ 20,000 for each of the years 1971 through 1973. By virtue of his position, he had supervisory authority over 14 to 16 employees. For some 25 years prior to and including the taxable year 1974, Hubble had been licensed to sellreal estate as a real estate agent. His family had been involved in real estate since 1918. Hubble's involvement in real estate included the purchase and sale of various interests in real estate, structuring various real estate "deals" and providing or arranging for the financing of such "deals." During 1973 and 1974, he owned 50 percent of the L. L. Hubble Co., Inc., which had been organized to operate a real estate business as either a principal, agent, or broker. The remaining 50-percent was owned by Carl E. Hubble. Petitioner Nancy Hubble (hereinafter Nancy) had been involved in real estate since her marriage to Hubble and had been licensed as a real estate *122 broker since 1957. She was the sole owner of the Hubble Co., which had been organized to operate a real estate business as principal, agent, or broker. Both the L.L. Hubble Co., Inc., and the Hubble Co. were used by petitioners to borrow the funds needed for various real estate transactions in which they engaged. By employing a corporate borrower, certain truth-in-lending laws could be circumvented thereby avoiding delays in obtaining the loan proceeds desired. Worthlessness of the Debt
Over a period of years prior to the taxable year 1974, petitioners had been involved in various real estate transactions with a man named Basiliko (hereinafter referred to as Basiliko). He was a real estate entrepreneur and in earlier years had been involved in certain real estate transactions with Hubble's father. Basiliko's brother George (hereinafter referred to as George Basiliko) was the sole owner of Crown Oil & Wax Co. (hereinafter Crown) until late 1974. Crown was engaged in the business of buying, selling, and developing real estate, as well as distributing petroleum products. Basiliko was Crown's representative for many of its real estate investments. In 1973, Basiliko approached *123 petitioners in regard to property located in Baltimore known as the Crosse and Blackwell building. Crown desired to purchase this property, but was having trouble raising $ 250,000 needed for such purchase. Basiliko proposed that petitioners join Crown in regard to ownership of the property by either contributing the funds needed themselves or by arranging for the financing of such funds. Prior to this time, petitioners had never loaned money to or otherwise engaged in real estate transactions with Crown. In response to Basiliko's offer, Hubble contacted David Gerber (hereinafter Gerber), a wealthy individual with whom he had been associated in prior real estate transactions and financing arrangements. Gerber initially agreed to loan Crown the entire $ 250,000 needed, but this agreement was subsequently modified whereby Hubble and Gerber arranged for Mercantile Safe Deposit and Trust Co. (the bank) to loan Crown $ 175,000 with Gerber to supply the remaining $ 75,000. A joint venture was thereafter formed in April 1973, with respect to ownership of the Crosse and Blackwell building, known as C&B Associates, a limited partnership (C&B). The partners included Crown (50-percent *124 owner), Gerber, and Hubble (25-percent owners each). To induce Gerber to enter into this transaction, Hubble agreed to indemnify Gerber for one-half of any loss which Gerber might suffer as a result of the $ 75,000 advance made to Crown. Hubble had received his interest in C&B for services rendered with respect of the financing of the purchase of the Crosse and Blackwell building, as well as for entering the indemnity agreement with Gerber. However, at no time was Hubble required to advance any funds with respect of the joint venture agreement. The loan made by the bank was secured by a first mortgage in the amount of $ 175,000 on seven percels of land owned by Crown and located in Frederick County, Md. (Frederick parcels). Gerber's loan was secured by a second mortgage in the amount of $ 75,000 on the same properties. Within 4 months after the formation of C&B, the partnership decided to sell the Crosse and Blackwell building to Exxon Oil Co. Thereafter, on July 13, 1973, in order to accomplish the sale, Crown purchased Hubble's 25-percent interest in C&B for $ 100,000, of which $ 1,000 was paid at the time of purchase. Of the remaining purchase price, $ 9,000 was to be paid *125 on November 1, 1973, and $ 90,000 was evidenced by three installment notes in the amount of $ 30,000 each, which became due at 1-year intervals beginning April 1, 1974, and which bore interest at a rate of 5 percent. These notes were secured by a third mortgage on the Frederick parcels in the amount of $ 90,000, and were personally guaranteed by Crown's president at the time, John Gilece, Jr. (Gilece) and George Basiliko, Crown's sole owner. In addition to its many other ongoing real estate projects, Crown acquired approximately 7 acres of land in Anne Arundel CountyMd. (Ramada Inn property), some time during 1972 for the purpose of constructing a Ramada Inn and office complex thereon (Ramada Inn project). To this end, on March 22, 1973, it obtained a construction loan commitment in the amount of $ 1.9 million from NJBPrime Investors, a Massachusetts business trust (NJB). This loan commitment, to the extent of amounts actually drawn upon by Crown, was secured by a first deed of trust on the Ramada Inn property. NJB initially advanced Crown $ 215,000 to pay for the indirect costs of construction. However, pursuant to the loan commitment agreement, no other advances on the loan *126 would be made until a building permit for the Ramada Inn project was obtained. Before such a permit could be obtained, sewage disposal service for the property had to be approved by the Anne Arundel County Bureau of Public Works. Unfortunately, the Anne Arundel Water and Wastewater Master Plan (master plan) provided that such property was located in an area which was not to have sewage disposal service until sometime after 1980. A letter to this effect, dated November 10, 1972 was sent to Crown's consulting engineers. Both Crown and NJB, however, remained optimistic in their hopes of obtaining sewer service for the Ramada Inn property within the near future and proceeded in preparing all the documents necessary to bring NJB's loan commitment to Crown into fruition. [2]
By mid-1973, Crown had begun to suffer serious cash flow problems. This was primarily a result of engaging in too many costly real estate transactions at the same time, as well as to the fact that the remaining NJB construction loan *127 proceeds remained unavailable since a building permit had not yet been obtained. In October 1973, Basiliko, on behalf of Crown, asked Hubble for a loan of $ 20,000 to help Crown pay its debts. Crown needed the money immediately as it lacked sufficient funds to cover certain checks it had written and foreclosure of certain of its properties was being threatened. Basiliko explained that the Ramada Inn project had run into trouble due to Crown's inability up to that point in time to provide for sewage disposal service with respect to such project. He assured Hubble that the "sewer situation" would be "straightened out" within 1 week, at which time Crown would be allowed to draw upon the $ 1.9 million construction loan commitment from NJB to repay him. He exhibited to Hubble the construction loan commitment from NJB, a grading permit, and various other documents and letters to the effect that the sewer situation would be resolved soon. Because Hubble was still owed $ 99,000 from Crown for the sale of his interest in C&B, he agreed to loan Crown the funds requested so that it could stay in business and eventually pay off the debt owed him. To effectuate this loan (loan No. 1), made *128 October 31, 1973, Nancy caused the Hubble Co. to borrow $ 20,000 and then to loan such funds to petitioners. Hubble then transferred these funds to Crown, and in return, received a Crown check in the same amount, made payable to him. He was advised shortly thereafter not to try to cash the check as Crown had not yet resolved the "sewer situation" with respect to the Ramada Inn project and did not have the funds necessary to cover such check. This check was never presented to any bank for collection. At the time of the loan, no interest was charged because Hubble thought he would be repaid within 1 week. In November 1973, Basiliko approached Hubble again requesting another loan on behalf of Crown, this time in the amount of $ 40,000. Again he assured Hubble that the sewer problems with respect to the Ramada Inn project would be resolved shortly and presented to him additional documents and letters in support of this assertion. Thereafter, Hubble loaned Crown the funds requested for essentially the same reason he made loan No. 1, i.e., to keep Crown in business so that it could eventually pay off the debt owed him. To effectuate this loan (loan No. 2), made November 21, 1973, *129 Hubble caused the L.L. Hubble Co., Inc., to borrow $ 25,000, and then to loan such amount to petitioners. Hubble then transferred $ 40,000 to Crown, and in return received a Crown check in the same amount, made payable to him. At the time of this loan, no interest was charged because Hubble thought he would be repaid within 1 week. Hubble was advised shortly thereafter not to try to cash the check as Crown had still not resolved the "sewer situation" with respect to the Ramada Inn project and lacked the funds necessary to cover such check. This check was never presented to any bank for collection. In December 1973, Basiliko once again approached Hubble for an additional loan on behalf of Crown in the amount of $ 40,000 and on December 3, 1973, Hubble in fact loaned such amount to Crown (loan No. 3). The reasons for Crown's need of these funds and Hubble's purpose for making such loan were the same as for loans Nos. 1 and 2. To effectuate this loan, Hubble caused the L. L. Hubble Co., Inc., to borrow $ 40,000, and then to loan such amount to petitioners.He then transferred $ 40,000 to Crown and received in return a Crown check in the same amount, made payable to him. For the *130 reasons stated with respect to loan Nos. 1 and 2, this check was never presented to any bank for collection. Moreover, as with the previous two loans, no interest was charged at the time this loan was made as Hubble was again assured he would be repaid within 1 week. In January 1974, Basiliko requested an additional loan on behalf of Crown in the amount of $ 15,000, needed for the same reason as for loan Nos. 1, 2, and 3. Basiliko assured Hubble that Crown was "on the verge" of resolving the sewage disposal problem with respect to the Ramada Inn project and that he would be paid soon. Hubble agreed to make the requested loan (loan No. 4), which was effected on January 14, 1974, by having the L.L. Hubble Co., Inc., borrow $ 15,000 from the First National Bank of Maryland, and then pay over such amount to Crown. However, it now appeared to Hubble that regardless of the assurances he received from Basiliko, Crown's sewage disposal problem would not be resolved quickly. Therefore, loan No. 4 was made only after Crown had agreed to secure the total amount it owed Hubble. In compliance with such agreement, on January 14, 1974, Crown executed a second mortgage in favor of petitioners *131 on the Ramada Inn property in the amount of $ 124,000 (a first deed of trust being in favor of NJB in the amount of $ 215,000). This mortgage consolidated loan Nos. 1 through 4, as well as $ 9,000 of the debt still owed Hubble by Crown for the purchase of his interest in C&B. [3] It was additionally agreed that the $ 124,000 owed would now bear interest at a rate of 20 percent per year, payable monthly beginning February 1, 1974. The entire amount was due in full on July 14, 1974. In addition, Crown gave petitioners a security interest in five automobiles and one truck owned by Crown, the total value of which was $ 15,000 at the time of this transaction. n3a At no time prior to making any of the loans herein did Hubble make any independent inquiries of Anne Arundel County officials to verify the statements made by Basiliko in securing these loans. *132 He relied solely on the fact that Crown had a loan commitment from NJB in the amount of $ 1.9 million, a grading permit, and various letters from Crown's attorneys and engineers to the effect that the sewage disposal problem would be resolved in a short period of time. He was unaware that Anne Arundel County's master plan did not provide for sewer connections to the Ramada Inn property until after 1980. Following the January 14, 1974, transactions as detailed above, Hubble remained in weekly contact with Basiliko concerning the progress of Crown. By March 1974, it began to appear that Crown would finally resolve the sewage disposal problem as the master plan was revised so that Anne Arundel County sewage service would be available to the Ramada Inn project by 1978 and plans were formulated to provide for an interim sewage treatment plant until that time. Unfortunately, by late 1974, the combination of a low cash flow and the fact that Crown had financially over-extended itself, had left Crown in a severe financial situation.Many of its projects were either still in the planning stages or were just under construction, and some of its construction loan commitments had been canceled. *133 The only cash flow generated was from the petroleum side of the business, and in light of the then current Arab oil embargo and the many obligations which Crown had, this cash flow was not enough to pay its debts as they became due. Consequently, a number of suits were instituted against Crown, and to satisfy the resulting judgments, creditors began to attach Crown's property. Hubble also had become concerned about the collection of the debt owed him, since, as of December 1974, no interest had been paid on such debt, let alone any of the principal, which had become due in its entirety on July 14, 1974. Toward the end of 1974, he had begun to make independent inquiries as to the availability of sewage disposal service for the Ramada Inn property. He was informed by certain Anne Arundel County officials that the land would not have sewer connections until after 1980. Thereafter, upon the advice of counsel, Crown filed a "Petition for Arrangement Under Chapter XI of the Bankruptcy Act" (petition for arrangement) on December 11, 1974. By order of court, the commencement or continuation of any legal proceeding against Crown was stayed as was any action to enforce liens against Crown's *134 property.Crown was permitted to remain in possession of its assets and to continue to operate its business. It hoped that by filing under chapter XI and continuing in operation it could salvage the petroleum side of the business. Although the chapter XI proceeding only protected Crown against claims of unsecured creditors, secured creditors were required to obtain leave of court before foreclosing. At no time during 1975 or 1976, while the chapter XI proceeding was in progress, did either NJB or petitioners seek permission to foreclose on their respective mortgage on the Ramada Inn property. Petitioners were informed of the chapter XI proceeding by a letter from Crown's attorneys dated December 17, 1974, as well as by Basiliko, who described Crown's cash flow problems and the resulting judgments and attachments which were occurring. At the time of filing the petition for arrangement, a schedule attached to the petition indicated that Crown had the following assets and liabilities: Fair market
Asset
value
Liability
Amount
Real Property
$ 7,729,245
Taxes owing U.S.
$ 419
Cash
473
Taxes owing States
257
Automobiles and
Taxes owing other
other vehicles
32,950
taxing authorities
51,609
Office equipment
Secured claims
6,543,921
and supplies
1,920
Unsecured claims
Inventory
27,500
without priority
1,101,385
Bonds and other
instruments
77,249
Total
$ 7,697,591
Other liquidated debts
135,214
Interests in
corporations
and other
incorporated
companies
20,000
Total
$ 8,024,551
The *135 Ramada Inn property was valued at $ 597,000 at the time the NJB construction loan commitment was obtained, and represented the value of the land with a Ramada Inn and office complex constructed thereon. The petition for arrangement included a schedule of Crown's properties and their respective fair market values (property schedule), which schedule listed the Ramada Inn property at the same value as determined at the time of the construction loan commitment. However, at the time the petition for arrangement was filed, Gilece, [4] who was the managing director of Crown and who had attested to this value, was unaware of the problems surrounding the Ramada Inn project. After filing the petition for arrangement, Gilece, together with Crown's attorneys, reviewed each project Crown was involved in to determine which were worth pursuing. The Ramada Inn project was not reviewed until March 1975, at which time it was decided it would not be further developed, and that they would *136 determine at a later date what, if anything, could be done with the Ramada Inn property. Thereafter, on October 21, 1975, Crown was authorized by court order to amend the property schedule submitted with its petition for arrangement. The value of its assets as listed therein had decreased to $ 6,634,551 as a result of revaluing certain real property interests, including the Ramada Inn property, which was valued at $ 450,000. [5]
Hubble was not aware that the Ramada Inn property had been valued at $ 597,000 in the petition for arrangement until he received a copy of such petition in January 1975. Based on the information he had received from Basiliko and Anne Arundel County officials, he did not believe the property would ever be developed as planned, and therefore felt it had been overvalued in the petition for arrangement. However, at no time during the chapter XI proceeding did he attempt to contradict the value as listed in such petition. In October 1975, Crown filed a petition for the release of four of *137 the six vehicles in which petitioners had been given a security interest. Thereafter, by a court order dated October 8, 1975, four automobiles were transferred to petitioners in exchange for a $ 10,000 credit against the debt owed them by Crown. [6] Pursuant to the order, petitioners released their security interest in the remaining two vehicles. On November 30, 1976, a Plan of Arrangement (plan) was confirmed and Crown was released from all unsecured debts, except as provided in the plan. Pursuant to this plan, unsecured creditors received either 13.5 percent of the debt owed them in a single lump-sum payment at the time the plan was confirmed or 22.5 percent if they elected to receive payment in four installments to be paid over 36 months. [7] Subsequently, the chapter XI proceeding was closed. At no time during such proceeding did petitioners obtain counsel to advise them as to what could be done to protect their position as creditors of Crown. While petitioners had the option to forego their unsecured position and collect as unsecured creditors pursuant to the plan which *138 was finally confirmed, they did not do so because at the end of 1974, as well as at the time such plan was confirmed, they were unaware this option existed. [8]
Following the close of the chapter XI proceeding in 1976, Crown continued in business, which primarily consisted of the distribution of petroleum products. It did, however, retain some of its real estate interests as well, including the Ramada Inn property. At some time during 1975 or 1976, while the chapter XI proceeding was in progress, Crown entered an agreement with NJB whereby NJB was given the option to either foreclose on or, in lieu of foreclosure, take a deed to any of the properties of Crown securing its debts, including the Ramada Inn property. To the extent this option was exercised, all debts owed NJB which were secured by the property were extinguished. [9] This option was *139 not exercised with respect to the Ramada Inn property during the chapter XI proceeding. However, on November 23, 1977, after the close of such proceeding, NJB foreclosed on its first deed of trust on the Ramada Inn property, causing it to be sold at auction. The property was purchased by NJB and United States Trust Co. of New York, assignee of NJB, for $ 200,000. At that time all outstanding liens against the property, including petitioners' second mortgage, were extinguished. On February 13, 1980, the chapter XI proceeding of Crown was reopened to reconsider the security position of the Farmers and Mechanics National Bank (Farmers). In June or July of 1976, Crown had been taken out of the chapter XI proceeding and put into a chapter X proceeding because it did not have enough money to fund a plan of arrangement. However, in November 1976, it obtained a loan from Farmers in the amount $ 125,000 to help fund such a plan and was therefore allowed to switch back to a chapter XI proceeding.Had it remained in chapter X, *140 Crown would have been required to liquidate and sell its assets to pay off its debts. As a result of the loan, Farmers received an indemnifying mortgage covering all the real property of Crown to the extent of $ 929,000. The chapter XI proceeding was subsequently closed. However, it was discovered in 1979 that the mortgage was not valid under Maryland law, and subsequently the chapter XI proceeding was reopened to reconsider Farmer's security position. Business v. Nonbusiness Debt
For the taxable year 1974 and for some 25 years prior thereto, petitioners had been involved in numerous real estate transactions.This involvement, described by Hubble as the "general practice of real estate" included the purchase and sale of real estate, structuring various real estate deals, and providing or arranging for the financing of such deals. During the taxable years 1971 through 1974, petitioners had income from the rental of various real properties. However, the rental of real property was not considered by petitioners as part of the ordinary course of their real estate "business," and the income therefrom was not included on the Schedule C, (Profit or Loss From Business or Profession) filed *141 with their tax returns for such taxable years. On their tax return for the taxable years 1971 and 1972, petitioners reported the gain on the sale of two pieces of real property sold under the installment method as long-term captial gain. In 1973, real property known as Bayside Beach, in which petitioners had a one-third interest, was sold under the installment method, and the gain from the sale was reported by petitioners as long-term capital gain on their tax return for the taxable years 1973 and 1974. According to Hubble, these properties were not part of his "business of buying and selling land," but rather were merely investments. Petitioners did report the $ 1,000 received from the sale of Hubble's interest in C&B on Schedule C of their tax return for 1973. [10]
Petitioners made loans to various individuals *142 and corporations over the years for the stated purpose of collecting interest and promoting the various real estate transactions in which they were involved. For the taxable years 1969 through 1974, petitioners made the following loans (not including the $ 115,000 loaned to Crown): Number of
Principal amount
Interest rate
Year
loans
of loan
Percent
1969
4
$ 4,885
[1] 8
1970
3
2,365
[2] 8
1971
2
3,106
[3] 8
1972
3
13,600
[4] 6
1973
1
6,000
8
1974
2
5,150
[5] 11 Following the taxable year 1974, petitioners continued to make loans, but because Hubble had come into a large sum of money during 1974, [11] both the size and number of these loans greatly increased, as well as the rate of interest charged on such loans. [12]Hubble had never obtained *143 a license to loan money, although he did obtain a mortgage broker's license in 1976. The loans made to Crown were not for the purpose ofd collecting interest or to further a real estate transaction, but rather, were made to keep Crown in business so that it could pay Hubble the $ 99,000 owed him from the purchase of his interest in C&B. For the taxable year 1974, the only record kept by petitioners with respect to their lending and real estate transactions was a checkbook. They had no office from which to conduct such transactions, and therefore used their home to do so. For the taxable year 1974, petitioners deducted the $ 115,000 they had loaned to Crown [13] as a business bad debt pursuant to section 166(a)(1).
In his statutory notice *144 of deficiency, respondent disallowed this deduction in toto. OPINION The sole issue for determination is whether petitioners are entitled to a business bad debt deduction under section 166(a)(1) for the taxable year 1974. Entitlement to a deduction under this section requires that the debt have become wholly worthless as of the end of 1974, [14] and have been created or acquired in connection with, or incurred in, a trade or business of petitioner. Petitioners maintain that the debt owed by Crown had become wholly worthless as of the end of 1974. This contention is based on Crown's financial situation at that time, the unavailability *145 of sewage disposal service for the Ramada Inn propety as perceived by Hubble, and the fact that Crown had filed a petition under Chapter XI of the Bankruptcy Act. Moreover, they assert that such debt was proximately related to their trade or business of the "general practice of real estate" and of loaning money, and therefore was properly deducted as a business bad debt. Respondent contends that petitioners have failed to prove that the debt owed by Crown became worthless is the taxable year 1974. This contention is based on the following assertions: (1) That because Crown filed a petition for plan of arrangement under chapter XI, it could remain in business and thus it was unreasonable to believe that Crown would not pay at least a portion of the debt owed petitioner; (2) that the debt was secured by a second mortgage and petitioners have not presented evidence to show such mortgage was worthless by the end of 1974; (3) that the debt was secured by a security interest in six vehicles valued at the time of obtaining such interest at $ 15,000; and (4) that petitioners could have collected at least a portion of the debt as unsecured creditors. Alternatively, respondent asserts that *146 even if the debt became worthless in 1974, it was not incurred in a trade or business of petitioners and any deduction therefor must be classified as a short-term capital loss pursuant to section 166(d).
Section 166(a)(1) allows a deduction for "any debt which becomes worthless within the taxable year." Worthlessness of a debt is determined by an objective standard which is met by a showing of identifiable events which form the basis of reasonable grounds for abandoning any hope of future recovery. Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1959). The subjective good faith opinion of petitioners alone is insufficient. Fox v. Commissioner, 50 T.C. 813 (1968), affd. per curiam (9th Cir. 1970).Whether a debt has become worthless is a question of fact, the answer to which lies in an examination of all the circumstances. Riss v. Commissioner, 56 T.C. 388, 407 (1971), affd. 478 F.2d 731 (8th Cir. 1973). The burden of proof with respect to this issue is on petitioners. Perry v. Commissioner, 22 T.C. 968 (1954); Rule 142(a), Tax Court Rules of Practice and Procedure.[15] *147 In order for petitioners to prevail, they must demonstrate that the debt in issue had some value at the end of 1973, and that it had become worthless by the end of the taxable year 1974.In this context, "worthless" means lack of potential value as well as any current liquid value. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Often, a showing that some identifiable event occurred during the course of the year will effectively demonstrate the absence of potential value, but such a showing is not indispensable. Fox v. Commissioner, supra.However, the mere fact that a business is on the decline, Bullock v. Commissioner, 26 T.C. 276, 300 (1956), affd. 253 F.2d 715 (2d Cir. 1958), or that it has failed to make a profit, Dustin v. Commissioner, supra, or that it either voluntarily has filed a petition for arrangement under Chapter XI of the Bankruptcy Act [16] or has been adjudicated bankrupt, Dallmeyer v. Commissioner, supra at 1292; Patten & Davies Lumber Co. v. Commissioner, 45 F.2d 556 (9th Cir. 1930), revg. a Memorandum Opinion of this Court, will not, without more, provide a reasonable basis for determining that an obligation is *148 worthless.
While we would agree that Crown's financial situation as of the end of the taxable year 1974 was tenuous at best, we do not find, based on the facts herein, that the debt owed by Crown to petitioners had become worthless as of that time. Certainly the fact that Crown had defaulted on many of its debts, including those owed to petitioners, and that it had filed under Chapter XI of the Bankruptcy Act would lend support to petitioners' claim that the debt was worthless. See Dustin v. Commissioner, supra at 504. However, at the end of 1974, it is not clear and was certainly not known that Crown was even insolvent, let alone adjudged bankrupt as petitioners seem to claim. Generally, insolvency "means an insufficient amount of property to pay all of the debtor's debts in full." 5J. Mertens, Law of Federal Income Taxation, sec. 30.57, p. 117 (1980 rev.). However, the schedule of assets and liabilities submitted with the petition for arrangement indicates that the value of Crown's assets were sufficient to pay all of its liabilities. Admittedly, Crown's asserts were overvalued, and in fact upon subsequent revaluation of those *149 assets in 1975, they were valued at $ 6,634,551, an amount less than the total liabilities. However, petitioners were unaware of what the value of these assets was at the end of 1974, and a subjective belief on their part that Crown was insolvent at that time was both pure speculation as well as insufficient to prove worthlessness. Even were Crown insolvent, its debt to petitioners would not necessarily have been worthless. Dustin v. Commissioner, supra.The extent of the insolvency and the possibility of collection must be ascertained by looking to all the surrounding circumstances. Riss v. Commissioner, supra; see Trinco Industries v. Commissioner, 22 T.C. 959 (1954). In the instant case, Hubble was informed in December of 1974 by Basiliko, a representative of Crown, of Crown's cash flow problems, the suits being instituted against it, and the resulting judgments and attachments which were occurring. Thereafter, Hubble was told by certain Anne Arundel County officials that the Ramada Inn property was not to be part of the county's sewage disposal system until after 1980 and sewer connections would not be available until then. Based upon this information as well as the fact that *150 Crown filed a petition under Chapter XI of the Bankruptcy Act, petitioners determined that Crown would be unable to pay the debt owed them. However, this too appears to be nothing more than speculation on the part of petitioners. By the end of 1974, the prospects of obtaining sewage disposal service for the Ramada Inn property had improved and it weas not until March 1975 that Crown decided the Ramada Inn project would not be pursued further. Moreover, although Crown was encountering serious financial problems, it filed under Chapter XI of the Bankruptcy Act, which-- provides for the proposal of an arrangement for the settlement, satisfaction, or extension of time of payment of unsecured debts. The petition under that chapter does not seek an adjudication, although such may ultimately be entered, and a liquidation and distribution of the debtor's property is not contemplated during the administration of a case under Chapter XI. [8 Collier Bankruptcy, sec. 1.02, pp. 5-6 (14th ed. 1978)]. The debtor in a chapter XI proceeding, Crown in this instance is allowed to remain in business, operating as before, but actions for collection of debts owed by such debtor are stayed so as to *151 allow it the time needed to pay off its debts as best it can; but it is not released from those debts. Crown was still operating as of the time petitioners filed the petition herein. Furthermore, with respect to the debt herein, petitioners were secured creditors, and as such were unaffected by the chapter XI proceeding which applies only to unsecured creditors. Sec. 307(1), Bankruptcy Act.Petitioners apparently believed that by filing under chapter XI, Crown had somehow been adjudged "bankrupt" and was thereby released from the debt owed them. They did not, however, seek legal counsel to advise them of the scope of a chapter XI proceeding. Of course, even had Crown been adjudged bankrupt, that fact alone would not constitute grounds for a bad debt deduction. Dallmeyer v. Commissioner, supra at 1292-1293. Certainly whenever the business fortunes of a debtor take a turn for the worse, creditors may reasonably be concerned as to collection of the debt owed them. Under the circumstances herein, the financial woes of Crown may have provided reasonable grounds to believe the debt was not worth much, but "in the exercise of sound business judgment based upon as complete informastion *152 as is reasonably obtainable," such debt could not have been considered worthless. Minneapolis, St. Paul Railroad Co. et al. v. United States, 164 Ct. Cl. 226 (1964); See Dustin v. Commissioner, supra at 503. The single fact that Crown remained actively engaged in business throughout the taxable year 1974, would reasonably indicate the debt had not become worthless in such year. See Riss v. Commissioner, supra at 409. Even had Crown's financial situation at the end of 1974 been so bleak as to warrant a reasonable belief that it would be unable to pay any of the debt owed petitioners, the fact remains that the debt was secured by a second mortgage on the Ramada Inn property in the amount of $ 124,000 as well as by a security interest in six vehicles in the amount of %15,000. The "value of the collateral, if any, securing the debt" must be considered in determining whether a debt is worthless, sec. 1.166-2(a), Icome Tax Regs., and the debt cannot be worthless until the security itself becomes worthless. See LeRoy v. Commissioner, 4 T.C. 70 (1944), affd. 152 F.2d 936 (2d Cir. 1945). Petitioners have the burden of proving the collateral is worthless. See Turbeville v. Commissioner, 31 B.T.A. 283 (1934), *153 affd. on other grounds 84 F.2d 307 (5th Cir. 1936); Rule 142(a). Petitioners have come forth with no evidence as to the value of the Ramada Inn property as of the end of 1974, other than Hubble's unsupported testimony that such value was less than the first deed of trust on the property in favor of NJB, which amounted to $ 215,000. The value placed on such property in the petition for arrangement was $ 597,000, and although this represents the value of the land assuming it would be developed, it was not until March 1975 that Crown had decided it would not develop the property as planned. Even had the decision not to develop the property been made prior to the end of 1974, petitioners presented no evidence as to what the value of property would have been without the planned development. Moreover, we note that on October 21, 1975, the value of the property was redetermined by Crown to be $ 450,000, enough to satisfy both NJB's and petitioners' respective debts. Although the property was sold in 1977 for only $ 200,000, subsequent events may not be used as evidence of the fact of worthlessness in the taxable year 1974. New York Water Service Corp. v. Commissioner, 12 T.C. 780, 788 (1949). *154 At some time during 1975, Crown and NJB agreed that at NJB's option, it could either foreclose on or, in lieu of foreclosure, take a deed to the various Crown properties securing its debts, including the Ramada Inn property. To the extent such option was exercised, all debts owed NJB which were secured by the respective property would be extinguished.If NJB proceeded by foreclosure, it would have extinguished petitioners' second mortgage. However, such option was not exercised with respect to such property while the chapter XI proceeding was in progress and even if such an agreement alone rendered the security worthless, which we do not believe it did, a subsequent event may not be used as evidence of the fact of worthlessness in the taxable year 1974. New York Water Service Corp. v. Commissioner, supra.
Even had the second mortgage become worthless by the end of 1974, petitioners had a security interest in six vehicles valued at $ 15,000 at the time such security interest was received on January 14, 1974. This security interest alone would render the debt worth something. Although another security interest in such vehicles was subsequently granted to Farmers, petitioners' security *155 interest appears to have had priority, especially in view of the fact that on October 8, 1975, petitioners received foure ofd these vehicles in exchange for a $ 10,000 credit against the debt owed them by Crown. Finally, even had petitioners' security herein become worthlerss as of the end of the taxable year 1974, in our opinion, they would still not be entitled to a bad debt deduction for such year.Although no provision of the Bankruptcy Act permits a plan of arrangement proposed pursuant to chapter XI thereof to affect the rights of secured creditors, "a secured creditor is the holder of an unsecured debt for such sum as may be owing over and above the value of the security." 9 Collier on Bankruptcy, sec. 7.05(4), p. 31 (14th ed. 1978). If a secured creditor files a claim under the plan of arrangement, the bankruptcy court is required to allow such claim to the extent it exceeds the value of the security, and the plan of arrangement must deal with such unsecured debt. Bankruptcy Rule 306(d), made applicable to chapter XI proceedings by Rule 11-33(e) thereof. Thus, if, as petitioners contend, their security was worthless, they could have opted out of their secured position and *156 filed a claim for the entire debt as an unsecured creditor. But, because they were unaware of this option, they did not do so. Although the end of 1974 was much too early in the chapter XI proceeding to determine how much unsecured creditors would be paid on the respective debts owed by Crown, it could not reasonably be said trhey would receive nothing. Crown's assets at the time it filed the petition for the plan of arrangement were valued at $ 8,024,552, exceeding its liabilities by some $ 326,961. Moreover, Crown remained in possession of its property and continued to operate its businesses. While petitioners need not be "incorrigible optimists," United States v. White Dental Co., 274 U.S. 398 (1927), neither should they be "incorrigible pessimist[s]," Dallmeyer v. Commissioner, supra; Minneapolis, St. Louis & Sault Ste. Marie RR Co. v. United States, supra.At the end of 1974, the verdict was still out as to whether unsecured creditors would receive any payment on their respective debts under a plan of arrangement. It was not until November 8, 1976, that such a plan was in fact confirmed. Using an objective standard as our measuring rod, we find that the facts herein clearly *157 establish that the debt was not wholly worthless at any time prior to or during the taxable year 1974. Petitioners have not shown the occurrence ofd identifiable events [17] within the taxable year 1974 which would form the basis of reasonable grounds for abandoning any hope for future recovery. Accordingly, we hold petitioners are not entitled to a business bad debt deduction for the taxable year 1974. [18]
Because of our holding herein, we do not decide whether the debt was incurred in, or acquired in connection with, a trade or business of petitioners. *158 [19]
Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. Approval for sewage disposal service for the property was never given, and a building permit was never obtained. Thus NJB's first deed of trust on the property never exceeded $ 215,000.↩
3. Respondent has not questioned the validity of the debt owed petitioners as a result of these loans. Rather he challenges the worthlessness of the debt. n3a This was the only security interest in such vechicles at the time. However, in July 1974, Farmers & Mechanics National Bank received a security interest in such vehicles as well.↩
4. Gilece had left Crown in December 1973, for personal reasons. He returned in November 1974 at the request of the Basiliko family to help salvage Crown. At that time all of the stock of Crown was assigned to him.↩
5. The schedule listed the property in two different places, once at a value of $ 450,000 and once at a value ofd $ 462,000. The reason for the difference was not explained.↩
6. The petition submitted by Crown stated that the fair market value of all four vehicles did not exceed $ 8,000.↩
7. An earlier Plan of Arrangement was filed June 27, 1975, but was not adopted. It proposed the same installment payment method as the plan which was confirmed, but did not provide for a single lump-sum payment. ↩
8. Petitioners were apparently unsecured creditors as well, but no evidence was presented as to the debt giving rise to this position.↩
9. Gilece had endorsed some of Crown's loans to NJB which were secured by mortgage. To the extent NJB exercised this option, his personal liability was extinguished.↩
10. For the taxable years 1971 through 1974, peitioners reported on their Schedule C the following amounts of gross income, the only evidence as to the source of which was the title of the business activity as listed on such schedule: ↩
Year
Business activity
Gross income
1971
Real estate service
$ 19,444
1972
Real estate service
19,145
1973
Real estate service
35,748
1974
Insurance and loans
2,965
1. No interest was charged on a loan in the amount of $ 1,725 to H. Roger, a judge of the District Court. The loan was made for personal reasons. ↩
2. No interest was charged on two loans totaling $ 465. ↩
3. No interest was charged on a loan in the amount of $ 765 to George and Sara Curtis. ↩
4. No interest was charged on a loan in the amount of $ 10,000 to Chappell Brothers, a business owned by friends of petitioners. ↩
5. The interest rate on one of these loans in the amount of $ 150 was 10 percent.↩
11. On Schedule B of their income tax return for 1974, petitioners reported a long-term gain from "partnerships and fiduciaries" in the amount of $ 301,490.05. ↩
12. In 1975 alone, petitioners made 36 loans in the total amount of $ 84,105, predominately at a rate of interest of 12 percent.↩
13. Petitioners did not claim a deduction under sec. 166↩, or any other section, for any other amount owed them by Crown. Their reason for not doing so was not explained.
14. Under sec. 166(a)(2) if the debt is a business debt which becomes partially worthless during the year a deduction may be allowed but in an amount not in excess of the amount charged off within the taxable year. Since petitioners did not "charge off" any part of the debt here involved in 1974, this provision is not applicable. Thus, to be entitled to any deduction under sec. 166 for 1974, petitioners must prove that the debt, whether business or nonbusiness, became wholly worthlerss within that year. References herein to "the end of 1974" refer to Dec. 31, 1974.↩
15. Unless otherwise indicated, any reference to "rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.
16. See Gilboy v. Commissioner, T.C.Memo. 1978-114↩.
17. The foreclosure upon property by a first mortgagee, thereby extinguishing all subsequent liens may, under certain circumstances, constitute the occurrence of such an identifiable event with respect to a second mortgagee. Cf. Heinemann & Co. v. Commissioner, 40 B.T.A. 1090, 1093 (1939); Ardis & Co. v. Commissioner, 12 B.T.A. 679, 681↩ (1928). 18. While the debt herein was not worthless at the end of 1974, it may well have become so in a later year. Sec. 6511(d)(1)(a) provides petitioners a 7-year period of limitation for purposes of claiming a refund on account of the deductibility of a debt which has become worthless under sec. 166↩.
19. While we need not and do not decide here whether the debt was a business bad debt or a nonbusiness bad debt, the circumstances which would determine that issue were those existing at the time the loans were made, and we have made findings with respect thereto, based on the evidence presented. Those circumstances suggest that even if petitioners' business could be said to include lending money for real estate ventures, it is pretty clear from petitioner's own testimony that these loans were made to protect petitioner's note received from Crown for his interest in C&B.↩