United States Court of Appeals,

Fifth Circuit.

No. 94-41087.

Richard W. COX and Kay L. Cox, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nov. 6, 1995.

Appeal from the United States Tax Court.

Before WISDOM, DUHÉ and BARKSDALE, Circuit Judges.

WISDOM, Circuit Judge:

Mr. and Mrs. Richard Cox, plaintiff/appellants, appeal a decision of the United States Tax Court upholding the findings of the Commissioner of Internal Revenue (Commissioner) regarding the plaintiffs' 1987 tax return. The plaintiffs challenge the Commissioner's decision to disallow their bad debt deduction for a loan to their wholly-owned corporation. Additionally, the plaintiffs assert that a nonjudicial foreclosure on their personal property, which they pledged as security for a loan to their corporation, also qualifies as a bad debt deduction or, alternatively, did not result in a taxable gain. We find that the tax court's decision is supported by the facts of this case and, accordingly, we AFFIRM.

I.

Richard Cox began working for Texas Light Bulb Supply Company (Light Bulb), which is located in Austin, Texas, in 1972. His salary from this position was the family's primary income for many

1

years.  By 1987, the Coxes were the sole shareholders of Light Bulb.

Between 1972 and 1987, Richard lent Light Bulb a total of $100,000, which the corporation was scheduled to repay.  At the end of 1987, the outstanding amount on these unsecured loans totalled $59,198 (the Cox loan).

In two transactions completed in May 1987, Light Bulb renewed two promissory notes from MBank, amounting to approximately $1,125,000.  Those notes (the MBank loans) matured in August of the same year.  Richard signed the notes both as president of Light Bulb and as co-maker.  Each note had a choice-of-law provision designating Texas law as controlling.

In June 1987, the Coxes borrowed $342,000 from Frontier National Bank (Frontier).  The Coxes signed as the makers of this note (the Frontier loan).  To secure payment of the Frontier and MBank loans, the Coxes executed a deed of trust, which provided that MBank's security interest was inferior to Frontier's interest.  The deed of trust covered property that was owned by the Coxes and leased by them to Light Bulb.  The property served as Light Bulb's place of business.

After Light Bulb defaulted on the MBank loans, MBank had a receiver appointed for Light Bulb in September 1987, asserting that approximately $1,100,000 was still outstanding on the loans.  On October 13, 1987, MBank began nonjudicial foreclosure on the property named in the deed of trust.  Two days later, Light Bulb filed for bankruptcy under Chapter 11.  In its bankruptcy filing,

Light Bulb listed its $1,100,000 debt to MBank and the debts to its unsecured creditors, but omitted listing any debts to the Coxes.

At the time of the bankruptcy filing, Light Bulb still owed the Coxes $59,198.  Relying on the advice of Eric Borsheim, the attorney hired to manage Light Bulb's bankruptcy, the Coxes decided not to include that debt on Light Bulb's bankruptcy filing. Borsheim advised the Coxes that listing their claim against Light Bulb could jeopardize the approval of any reorganization plan in which they retained the company because Light Bulb lacked sufficient capital and assets to compensate fully its unsecured creditors.

In December 1987, MBank purchased the Coxes's property for $490,000 at the foreclosure sale, at which time the Coxes's adjusted basis in the property was $451,831.  Subsequently, MBank paid Frontier $342,888.47, which was equivalent to the outstanding amount on the Frontier loan.  MBank marked "Payoff of first lien" on the check with which it paid Frontier.  An internal MBank memorandum states that MBank paid off the Frontier loan, and did not purchase it.  Other MBank records, however, indicate that MBank raised the outstanding indebtedness of Light Bulb and the Coxes by an amount equal to the Frontier loan balance, suggesting that MBank purchased the loan.  During the reorganization negotiations, MBank also refused to discuss its handling of the foreclosure proceeds. At trial, several witnesses agreed that MBank purchased the Frontier loan, but none of the witnesses had any personal knowledge as to how MBank actually treated those funds.

3

In December 1988, MBank released the Coxes's property from the lien, but maintained all of its rights against the parties. By March 1989, MBank was insolvent and the FDIC had placed it into receivership. In May 1990, Light Bulb filed its reorganization plan and pursuant to a deal arranged under this plan, MBank's successor bank released Light Bulb and the Coxes from all liens.

On their 1987 tax return, the Coxes initially claimed no deductions for their loans to Light Bulb nor for the foreclosed property. On amended returns, however, the Coxes asserted that they were entitled to a refund because the loans to Light Bulb qualify as bad business debts. The Commissioner rejected their deduction and found that the Coxes were deficient on their taxes because they did not report their gain arising out of the foreclosure sale of their property. The tax court agreed with the Commissioner, disallowing the bad debt deductions and holding that the Coxes realized a gain on the foreclosure. The Coxes now appeal the tax court's decision to this Court.

## II.

A finding of a deficiency by the Commissioner carries a presumption of correctness, which the taxpayer may rebut by a preponderance of the evidence.[1] "[T]he Tax Court's determination that a taxpayer has failed to come forward with sufficient evidence to support a deduction is a factual finding subject to reversal

[1]*Portillo v. C.I.R.,* 932 F.2d 1128, 1133 (5th Cir.1991); *see also Potito v. C.I.R.,* 534 F.2d 49, 51 (5th Cir.1976) (per curiam) (citing *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933)), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 751 (1977).

only if found to be clearly erroneous".[2]

### III.

Internal Revenue Code (I.R.C.) § 166(a)(1) (1987) allows taxpayers to deduct any business debt that becomes wholly worthless during the tax year in which the deduction is taken. The Commissioner did not challenge the notion that the Coxes's loan to Light Bulb was a business debt; rather, the only issue with respect to this deduction is whether the debt became "wholly worthless" in 1987.

The Coxes must prove that on January 1, 1987, the debt had some value, which was totally lost by December 31 of that year.[3] Although the Coxes assert that the Court should review the worthlessness issue *de novo,* the clearly erroneous standard applies. The worthlessness of a debt is a factual determination made by the tax court;[4] thus, it can be reversed only if the tax court's finding that the debt was not wholly worthless is clearly erroneous.[5] The taxpayer must prove worthlessness of the debt by a preponderance of the evidence.[6]

The primary point of contention regarding this debt, and the part most closely scrutinized by the tax court, is whether the Cox

---

[2]*Portillo,* 932 F.2d at 1134.

[3]*Estate of Mann,* 731 F.2d 267, 275 (5th Cir.1984).

[4]*Id.* at 276; *see also Cole v. C.I.R.,* 871 F.2d 64, 66 (7th Cir.1989); *Hubble v. C.I.R.,* 42 T.C.M. (CCH) 1537, 1544, 1981 WL 11042 (1981).

[5]*Portillo,* 932 F.2d at 1134.

[6]*Mann,* 731 F.2d at 276.

loan became wholly worthless during 1987. The tax court found the Coxes did not prove by a preponderance of the evidence that the Cox loan lost all of its value. The record does not reveal that this conclusion is clearly erroneous.

A debt becomes "wholly worthless when there are reasonable grounds for abandoning any hope of repayment in the future".[7] The taxpayer must demonstrate an identifiable event that rendered the debt worthless;[8] the Coxes argue that Light Bulb's bankruptcy served as the defining event. Indeed, "the debtor's serious financial reserves, insolvency, lack of assets, ... [and the creditor's] unsecured or subordinated status" are all factors supporting the Coxes's claim of worthlessness.[9] The debtor's bankruptcy, however, is not enough by itself to establish worthlessness.[10]

The Coxes further argue that Light Bulb was insolvent at the time that it declared bankruptcy, relying on the company's bankruptcy filing, which states that Light Bulb's debts exceeded its liabilities by several hundred-thousand dollars. Additionally, the Coxes rely on the testimony of the attorney retained by the Coxes to handle Light Bulb's bankruptcy. During the tax court proceedings, Borsheim explained:

I told them not to waste their time filing a proof of

---

[7]*Id.; see* Tres.Reg. § 1.166-2(b) (1987).

[8]*Hubble,* 42 T.C.M. (CCH) at 1544, 1981 WL 11042.

[9]*Cole,* 871 F.2d at 67.

[10]*Hubble,* 42 T.C.M. (CCH) at 1544, 1981 WL 11042.

6

claim [of the Cox loan] at all. That there was no way that that proof of claim would ever be paid in this bankruptcy proceeding....

This was a case that was never going to pay 100 percent to the unsecured creditors in the case; never. And as such, the only way the Coxes were ever going to keep this corporation was to convince the creditors in the case to vote for the payment of a dividend that was going to be substantially less than 100 cents on the dollar.

It was going to be perhaps ten or 20 cents on the dollar, at most. And under those circumstances, the debtor can never, with a straight face, say, well, creditor I am going to pay you 20 cents on the dollar and, by the way, I want to keep my company and I want to pay me 20 cents on the dollar.

That will never work in the real-day world. That claim is worthless on the day that they filed bankruptcy.

According to the Coxes, this testimony, combined with the insolvency and bankruptcy of the Light Bulb, provide sufficient evidence of the claim's worthlessness.

Contrary to the Coxes's opinion, Borsheim's testimony does not prove the worthlessness of the debt. Borsheim testified that unsecured debtors could expect to be paid ten to twenty percent of their claim. This uncontroverted testimony supports the possibility that if the Coxes had filed their claim, then they would have recovered some of that loan; thus, the tax court and the Commissioner argue that the Cox loan was partially, not totally, worthless. The Coxes counter by arguing that I.R.C. § 166(a) does not require the taxpayer to pursue collection of the debt if "in the exercise of "sound business judgment' " there were "reasonable grounds for abandoning any hope of repayment in the

future".[11]  The Coxes interpret Borsheim's testimony to state that the Coxes could not reasonably expect to recover their claim in the Chapter 11 reorganization because no reorganization plan would be approved in which the Coxes filed a claim.

The Coxes, in fact, did make a business judgment:  they surrendered their right to file a claim on the Cox loan in exchange for the possibility of reorganizing *and* retaining control of their company.  In light of these facts, it does not seem that in all probability an action to collect the debt would have been entirely unsuccessful,[12] provided that the Coxes were willing to surrender control of their company.[13]  The Coxes, then, traded the opportunity of recovery on the Cox loan for a chance to reorganize Light Bulb while retaining ownership of it;  as such, they cannot now attempt to have their cake and to eat it too by keeping their company and writing off a debt whose total worthlessness they have not established.[14]

---

[11]*Mann,* 731 F.2d at 276;  *see* Tres.Reg. § 1.166-2(b);  *Cole,* 871 F.2d at 67;  *Gladstone v. C.I.R.,* 59 T.C.M. (CCH) 303, 305, 1990 WL 34210 (1990).

[12]*Dustin v. C.I.R.,* 467 F.2d 47, 48 (9th Cir.1972).

[13]*See Cole,* 871 F.2d at 67 (stating that one factor weighing against worthlessness is the creditor's failure to press for payment of the debt, especially when the creditor is in some way affiliated with the debtor).

[14]The Coxes also argue that they are entitled to a bad business debt deduction to the extent that the foreclosure proceeds were applied to Light Bulb's debts on which they were guarantors.  *See* Tres.Reg. § 1.166-9.  Assuming that the Coxes timely raised this issue, they still did not prove worthlessness by a preponderance of the evidence.  For the same reasons as with the Cox loan, the tax court was not clearly erroneous in finding that the Light Bulb debt for the amount of the proceeds became

IV.

The Coxes next challenge the Commissioner's finding that the Coxes received a taxable gain from the foreclosure sale of their property. It is a well-established rule that a foreclosure sale constitutes "a disposition of property" within the meaning of I.R.C. § 1001.[15] Under this provision, "the amount realized from the sale or disposition of property shall be the sum of money received plus the fair market value of property (other than money) received".[16] The Coxes do not contest this general rule governing foreclosure sales; rather, they argue that the rule is inapplicable in their situation because they received no gain from the sale of their property and also because the foreclosure was void.

The two arguments proffered by the Coxes are intertwined: they assert that the foreclosure sale was void because they never received the proceeds from the sale. Texas law holds that foreclosure sales are invalid when the mortgagor is not paid the proceeds of the sale in cash or, when the mortgagee is the

---

totally worthless in 1987. Furthermore, the Coxes failed to prove the allocation of the proceeds between the Coxes's personal debts and Light Bulb's debts. Finally, the Coxes also do not satisfy this Court that any right of subrogation that they may have had against Light Bulb also became totally worthless in 1987. *See id.* § 1.166-9(e)(2).

[15]*Helvering v. Hammel,* 311 U.S. 504, 512, 61 S.Ct. 368, 372, 85 L.Ed. 303 (1941); *Freeland v. C.I.R.,* 74 T.C. 970, 977, 1980 WL 4434 (1980). Nonjudicial foreclosure sales also qualify as realizing events. *Chilingirian v. C.I.R.,* 918 F.2d 1251, 1254 (6th Cir.1990).

[16]I.R.C. § 1001(b).

purchaser, if the mortgagee does not credit the mortgagor's debt with the amount of the purchase price.[17] It is undisputed that the Coxes never received cash from their foreclosure sale. The issue is whether the proceeds were applied towards their indebtedness.

The Coxes contend that MBank never credited their debt with the foreclosure price of their property, but rather purchased the Frontier loan from Frontier. The Coxes point to certain evidence to support this scenario. For example, according to certain MBank records, MBank increased Light Bulb's indebtedness on its books by the same amount that MBank paid to Frontier. Additionally, Harvey Corn, the accountant handling Light Bulb's bankruptcy, testified that the reorganization plan was based solely on the debtor's ability to pay and did not consider the foreclosure proceeds. Thus, denying that they received credit towards their indebtedness, the Coxes argue that the foreclosure sale was void under Texas law.

In light of the evidence in the record, though, the tax court was not clearly erroneous in finding insufficient evidence that the foreclosure sale was invalid. As properly noted by the tax court, the evidence is "unclear as to the extent to which Mr. Cox was credited, which debts were credited, and when the debts were credited".[18] At the very least, the Coxes clearly received the

---

[17]*See Habitat, Inc. v. McKanna,* 523 S.W.2d 787, 790 (Tex.App.1974).

[18]*Cox v. C.I.R.,* T.C.Memo 1994-189, at 16, 1994 WL 151311 (Apr. 28, 1994) (No. 7502-92). For instance, MBank's notation on the check used to pay Frontier and the internal MBank memorandum both suggest that MBank did pay off, not purchase, the Frontier loan.

credit that they deserved when, in 1990, they were released from their liabilities to MBank.[19]  This fact alone casts serious doubt on the Coxes's argument.

The Commissioner's position is further supported by the fact that even if MBank did not immediately credit the Coxes's debt, the Coxes still had an undisputed right to a credit in the amount of $490,000 when MBank paid that price at the foreclosure sale.[20]  The foreclosure sale is the "definitive event that establishes gain or loss"[21] because at that point, the amount of debt of which the taxpayer has been relieved is known and any gain or loss can be computed.[22]  Once the foreclosure sale occurred, the sale price of the property and the Coxes's adjusted basis in that property were fixed, allowing for an accurate assessment of the Coxes's gain on the transaction.  The amount realized from the foreclosure sale includes the amount of relieved indebtedness.[23]  In the Coxes's case, then, they were relieved of $490,000 of debt when their adjusted basis on the property was $451,831, leaving them with a

---

[19]When the mortgagor's debt will be credited with the proceeds of the foreclosure sale, the policies that require cash buyers at foreclosure sales to pay the mortgagee at the time of the sale or in a reasonable time thereafter do not apply. *Intertex, Inc. v. Cowden,* 728 S.W.2d 813, 816 (Tex.App.1987).

[20]*Resolution Trust Corp. v. Westridge Court Joint Venture,* 815 S.W.2d 327, 330 (Tex.App.1991).  The deed of trust also provided for the Coxes's debt to be credited in the event of foreclosure.

[21]*Eisenberg v. C.I.R.,* 78 T.C. 336, 344-45, 1982 WL 11160 (1982).

[22]*Helvering v. Hammel,* 311 U.S. at 512, 61 S.Ct. at 372.

[23]*See Freeland,* 74 T.C. at 975-76, 1980 WL 4434.

taxable gain of $38,169.

The Coxes finally argue that there was no realizing event because they never received credit for the sale of their property and that when they were finally released from their liens, the release was a direct result of the reorganization negotiations and not the foreclosure.  As explained above, however, the realizing event was the foreclosure sale, at which point the Coxes's realized gain is determinable.  For these reasons, we conclude that the Coxes are properly taxable on the gain that they received from the sale of their property at the foreclosure sale.

V.

There was no clear error in the holdings of the tax court. This Court AFFIRMS the tax court.

12