**RESOLUTION TRUST CORPORATION,**
Appellant,

v.

**WESTRIDGE COURT JOINT VENTURE,**
Victor E. Paulos, Dan Lamountt, and J. Stanley Stephen, Appellees.

**No. 01–90–00448–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 22, 1991.

Rehearing Overruled Sept. 12, 1991.

Jack N. Ross, Dallas, for appellant.

Robert L. Ketchand, Mark Siurek, Kent A. Caperton, Houston, for appellees.

Before HUGHES, SAM BASS and DUNN, JJ.

## OPINION

HUGHES, Justice.

This appeal is taken from a case tried to the bench. Resolution Trust Corporation, as successor in interest to Southwest Savings Association (Southwest), appeals the trial court's judgment that it was not entitled to recover a deficiency for default on a loan secured by real property from Westridge Court Joint Venture (Westridge), Victor E. Paulos, Dan Lamountt, and J. Stanley Stephen (hereinafter collectively referred to as appellees), because it purchased the real property at the foreclosure sale for a gross underbid. We reverse.

Paulos, Lamountt, and Stephen formed Westridge to build 18 four-plexes (the project) on property located in Bryan–College Station. In April 1981, Westridge entered into a construction loan agreement with Bi–Stone Savings Association (Bi–Stone). Pursuant to the agreement, Westridge borrowed $1,728,000 to finance the construction of the project.

In exchange for the funds, Westridge executed a promissory note payable to Bi–Stone. Further, repayment was secured by a deed of trust, which created a first lien on the project. Construction of the project was completed in three stages. As each of the three stages was complete, Bi–Stone extended permanent financing for each four-plex built.

Between September 18, 1981, and December 1, 1981, each of the three stages of the project were refinanced. During that period, Paulos, Lamountt, and Stephen executed numerous promissory notes, creating a total principal indebtedness of $1,944,000. The notes were due to mature in the latter part of 1984. As the due dates for the notes approached, Westridge expressed an inability to perform, and Bi–Stone agreed to renew the loans. Also in 1984, Southwest merged with Bi–Stone keeping the designation "Southwest Savings Association."

Paulos, Lamountt, and Stephen became dissatisfied with the occupancy rate of the project. Consequently, in the spring of 1985, they sought new management and contacted DFAI. DFAI informed Paulos, Lamountt, and Stephen that it had a program specifically designed to service distressed properties. In essence, DFAI proposed to manage the project and attempt to increase the occupancy rate to 90% to 95%. Once that occurred, DFAI would purchase the property for a price that would allow Southwest to recoup the money it had funded into the project. After acquiring a number of similarly situated properties, DFAI intended to make a public bond offering, for which the pooled real estate properties would provide debt service on the bonds.

DFAI represented that it would take 12 to 18 months to increase the occupancy rate of the project to a level required to place it in one of the bond pools. Once the project was placed in a bond pool, and the bond offering funded, DFAI proposed to retire the entire indebtedness owed to Southwest.

After several months of negotiation, DFAI, Paulos, Lamountt, and Stephen executed a contract, in which DFAI agreed to purchase the project for $2,043,194.35. Because DFAI did not secure the necessary letters of credit, the sale did not close as scheduled. The sale finally closed on August 26, 1986, after Southwest agreed to substitute collateral belonging to Paulos, Lamountt, and Stephen for the letters of credit.

DFAI defaulted on its obligations to Southwest in December 1986. In response, Southwest accelerated the indebtedness and had the project posted for foreclosure. Before foreclosure could occur, the trial court granted Paulos', Lamountt's, and Stephen's application for a restraining order. That suit was later dismissed at Paulos', Lamountt's, and Stephen's request. Southwest then attempted to reach an agreement with the parties. It proposed that the maturity date of the notes be postponed to August 1, 1987, and for a pay rate equal to the greater of the net operating income of the project or 3% of the outstanding indebtedness.

Southwest later amended the agreement to provide that the February, March, and April net operating income payments would be due on May 22, 1987. DFAI failed to pay the amounts due on May 22, 1987. On June 12, 1987, Southwest gave formal notice to DFAI, Paulos, Lamountt, and Stephen of DFAI's default and its intent to accelerate the debt. On September 1, 1987, Southwest foreclosed on the project. Southwest's bid of $957,600 was the only one received, and consequently, Southwest acquired the project.

Paulos, Lamountt, and Stephen responded by filing a suit against Southwest and DFAI. Both answered by way of general denials. Later, Southwest brought a counterclaim against Paulos, Lamountt, and Stephen and a cross-claim against DFAI for the deficiency between the outstanding debt and the price bid at the foreclosure sale.

DFAI failed to appear at trial. The trial court's final judgment reflects that Southwest was awarded a default judgment against DFAI for $1,976,609 plus attorney's fees and cost. The final judgment further reflects that the trial court held, pursuant to the Uniform Declaratory Judgments Act, TEX.CIV.PRAC. & REM.CODE ANN. § 37.001 et seq. (Vernon 1986), Southwest was not entitled to recover a deficiency judgment, against appellees, because it grossly underbid the subject real property at the real estate foreclosure sale. The trial court further assessed attorneys fees and costs against Southwest.

An examination of the trial court's finding of facts and conclusion of law demonstrates that the trial court determined the fair market value of the project was at least $1,500,000, at the time of the foreclosure sale, and that Southwest's bid of $957,600 was grossly inadequate. The trial court further determined, that because Westridge, Victor E. Paulos, Dan Lamountt, and J. Stanley Stephen were guarantors of the notes, Southwest owed them a duty of good faith and fair dealing as well as a fiduciary duty. Further, the trial court found that Southwest's failure to conduct a commercially reasonable foreclosure sale constituted a breach of those duties.

In its first point of error, appellant asserts that it should have been awarded recovery against appellees for the deficiency owing under the notes as a matter of law. It submits that the trial court erred in denying recovery. Under point of error number one, appellant raises six sub-issues:

1. The trial court erred in finding a fiduciary duty and breach of that duty by Southwest's foreclosure of the project.
2. The trial court erred in finding a duty of good faith and fair dealing and a breach of that duty by Southwest's foreclosure of the project.
3. The trial court erred in finding that Southwest did not act in a commercially reasonable manner when Southwest foreclosed on the project.
4. The trial court erred in finding Southwest grossly underbid the foreclosure amount.
5. The trial court erred in finding an irregularity in the foreclosure sale.
6. The trial court erred in denying Southwest recovery of its deficiency on its counterclaim.

Southwest's second point asserts that the trial court erred by declaring that Southwest's foreclosure was irregular, since there was no evidence or insufficient evidence to support such a determination. We shall address appellant's second point of error first, and determine whether the foreclosure sale was irregular.

▇ It is the law of this state that upon a valid sale, the mortgagee is entitled to a judgment for the amount of the note, interest, and attorney's fees, less the amount received at the trustee sale and other legitimate credits. *Tarrant Sav. Ass'n v. Lucky Homes, Inc.*, 390 S.W.2d 473, 475 (Tex.1965). If the sale is invalid, and the title to the property has passed to a third party, or the property has been appropriated to the use and benefit of the mortgagee, the mortgagor is entitled to have the reasonable market value of the property credited on the note. *Id.*

▇ Typically, mere inadequacy of price will not invalidate a foreclose sale. *Savings Ass'n of Houston v. Musick*, 531 S.W.2d 581, 587 (Tex.1975); *Tarrant Sav. Ass'n*, 390 S.W.2d at 475; *Donaldson v. Mansel*, 615 S.W.2d 799, 802 (Tex.App.— Houston [1st Dist.] 1981, writ ref'd n.r.e.). The defendants must also raise a fact issue with respect to the propriety of the sale. *Tarrant Sav. Ass'n*, 390 S.W.2d at 475. Appellees argue that because this case was not tried under the theory of wrongful foreclosure, the above cited legal principles are not applicable. They contend that with regards to a deficiency suit, the measure of a mortgagee's damages is the amount of the note, interest, and attorney's fees, less the market value of the property at the time of the foreclosure sale.

In support of their argument, appellees direct our attention to our decision, *Greater Southwest Office Park LTD., v. Texas Commerce Bank National Association*, 786 S.W.2d 386 (Tex.App.—Houston [1st Dist.] 1990, writ denied). There, we held under the facts of that case, mere inadequacy of consideration was not grounds for setting aside a trustee sale. *Id.* at 388. To insure the limited applicability of that case, we stated:

"The Bank did not sue Greater Southwest for a deficiency balance; therefore, the holdings made in this opinion are not intended to express our opinion in cases involving a deficiency suit when the debtor is claiming that the lender grossly underbid on the foreclosed reality."

*Id.* at 387–88.

Appellees assert that the present case is squarely on point with the issue reserved

in *Greater Southwest Office Park.*[1]

Since our rendition of judgment in *Greater Southwest Office Park*, the Texas Legislature has amended the Property Code to include a provision that now affords protection to persons like appellees.[2] Under the amendment, after a foreclosure sale of real property, parties against whom recovery of a deficiency is sought, may ask the court to determine the fair market value of the property sold. If the court determines that the fair market value is greater than the price the real property sold at foreclosure, the debtor is entitled to an offset against the deficiency in an amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real property that was not extinguished by the foreclosure, exceeds the sale price.

Section two of the act amending section 51.003 is germane to the issue before this court. It expresses the legislature's directive concerning retroactive application of the act. Section two reads as follows:

> This Act applies to an action to recover a deficiency resulting from a foreclosure sale that is conducted on or after the effective date of this Act (April 1, 1991). An action to recover a deficiency resulting from a foreclosure sale that is conducted before that date is governed by the law as it existed on the date of the sale, and the prior law is continued in effect for that purpose. This Act in no way impairs the existing ability of a private mortgage guaranty insurer to exercise its subrogation rights against any person liable for a deficiency.

The above language compels us to believe that the legislature understood that by enacting this legislation, it was substantively changing the prior law. *See University of Texas at Austin v. Joki,* 735 S.W.2d 505, 508 (Tex.App.—Austin 1987, writ denied) (it is a well established rule of statutory construction that every word, sentence, clause, and phrase of a statute has been used for a purpose and should be given effect). Moreover, as we have previously stated, we have concluded the prior law to be thus: upon *a valid sale* the mortgagee is entitled to a judgment for the amount of the note, interest, and attorney's fees, less the amount received at the trustee sale and other legitimate credits;[3] mere inadequacy of price *will not invalidate* a foreclosure sale;[4] and therefore, once a lender makes a prima facie case that foreclosure was valid, the burden shifts to the debter to produce some evidence, other than mere inadequacy of price, that the foreclosure sale was invalid.[5]

■ Reviewing the trial court's finding of facts and conclusion of law, it is apparent that the trial court made the legal conclusion that the foreclosure sale was irregular based on the following factual determinations: 1) the fair market value of the project at the time of foreclosure sale was $1,500,000; 2) Southwest bid $957,600 at the foreclosure sale; and 3) a gross disparity exists between the bid price and the fair market price. Absent is any finding that appellant committed some act of wrongdoing, misconduct, or unfairness. Therefore, we hold that appellant conducted a valid foreclosure sale and, pursuant to the rule pronounced in *Tarrant Savings Association,* 390 S.W.2d at 475, was enti-

1. Further, appellees rely on *Olney Savings & Loan Association v. Farmers Market of Odessa, Inc,* 764 S.W.2d 869 (Tex.App.—El Paso 1989, no writ); *Halter v. Allied Merchants Bank,* 751 S.W.2d 286, (Tex.App.—Beaumont 1988, writ denied); *Lee v. Sabine Bank,* 708 S.W.2d 582 (Tex.App.—Beaumont 1986, writ ref'd n.r.e.). Each of these cases were discussed and distinguished from the issue at bar in *Greater Southwest Office Park,* 786 S.W.2d at 388–89.

2. Tex.Prop.Code Ann. § 51.003. Act of April 1, 1991, 72nd Leg., R.S., ch. 12, § 1, 1991 Tex.Gen. Laws 39, 40.

3. *Tarrant Savings Association,* 390 S.W.2d at 475.

4. *Musick,* 531 S.W.2d at 587.

5. *Tarrant Savings Association,* 390 S.W.2d at 474; *see also Georgetown Associates, LTD v. Home Federal Savings and Loan,* 795 S.W.2d 252, 254–55 (Tex.App.—Houston [14th Dist.] 1990, writ dism'd w.o.j.).

tled to a judgment for the amount of the note, interest, and attorney's fees, less the amount received at the trustee sale and other legitimate credits.

Appellant's second point of error is sustained.

■ Finding the foreclosure sale to be valid, we next turn to appellant's first point of error. Simply put, we must determine what duties Southwest owed appellees. When faced with a similar issue, the Fourteenth Court of Appeals concluded that with respect to a foreclosure sale, a mortgagee owes but one duty to the mortgagor, to conduct the sale *properly. Georgetown Associates,* 795 S.W.2d at 256. We concur. We further hold that a mortgagor owes a guarantor the same duty.

■ In this case, the trial court determined that Southwest owed appellees (as guarantors to the note) the duty of good faith and fair dealing, as well as a fiduciary duty. The trial court held that appellant had breached those duties, based solely on its finding that a gross disparity exists between the bid price and the fair market value of the property. It has already been established that the foreclosure sale was valid, and that the evidence offered by appellees is insufficient to attack its validity. Because the sale was conducted validly, we infer that it was conducted properly.

Appellant's first point of error is sustained.

■ Appellees raise a cross-point of error, asserting that the trial court erred in determining that they were not consumers under the Texas Deceptive Trade Practices Act (DTPA).[6] It has long been recognized that before a party may bring a cause of action under the DTPA, the party must establish that he is a consumer. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 172–73 (Tex.1980). A consumer is defined as one who seeks or acquires by purchase or lease, any goods or services. TEX.BUS. & COM.CODE ANN. § 17.45(4). (Vernon 1987).

■ Generally, a party who seeks or acquires money in a transaction is not neces-

sarily a consumer. *Riverside Nat'l Bank,* 603 S.W.2d at 172–73. In this case, the trial court found the transaction between Southwest and appellees involved the acquisition of financing for a real estate transaction. However, the trial court also found that Southwest provided appellees additional services, namely, collection and payment of ad valorem taxes, disbursement of insurance premiums, maintenance of insurance policies, and assistance to DFAI in having the project included in the bond pool. Appellees contend that because the trial court found that they had acquired additional services, it erred in concluding that they were not consumers under the DTPA. *See Cook v. Rowhanian,* 774 S.W.2d 679, 681 (Tex.App.—El Paso 1989, writ denied).

■ We need not decide whether appellees are consumers with regard to the loan acquisition. This is because they have failed to complain of any violation of the DTPA emanating from the acquisition of the project or the financing of the project. An examination of their pleadings demonstrates our point. In their claim, appellees assert: "Southwest's conduct in foreclosing on the Project constitutes a violation of the DTPA because such conduct constituted an unconscionable course of action as that term is defined under Texas law. TEX.BUS. & COM.CODE ANN. § 17.45(4). (Vernon 1987). Under the DTPA, an unconscionable action is defined as one which results in gross disparity between the value received and the consideration paid."

"Purchasers" may complain of a gross disparity between the value received and the consideration paid. *Chastain v. Koonce,* 700 S.W.2d 579, 581–83 (Tex.1985). Under the circumstances in the instant case, Southwest was the "purchaser" at the foreclosure sale. Because appellees were not "purchasers," they cannot complain that the price obtained at the foreclosure sale violated the DTPA.

Appellees' cross-point is overruled.

The judgment of the trial court is reversed. We remand the cause to the trial

---

6. TEX.BUS. & COM.CODE ANN. § 17.41 et seq. (Vernon 1987).

court with instructions to enter judgment that the Resolution Trust Corporation receive an award of the difference between the price received at the foreclosure sale and the balance due on the notes, plus attorneys fees and costs.