RICHARD W. COX AND KAY L. COX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cox v. Commissioner
Docket No. 7502-92
United States Tax Court
T.C. Memo 1994-189; 1994 Tax Ct. Memo LEXIS 188; 67 T.C.M. (CCH) 2809; April 28, 1994, Filed *188 Decision will be entered under Rule 155. For petitioners: John McDuff. For respondent: Steven B. Bass. FAY
FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in Federal income tax and additions to tax for petitioners as follows: Additions to Tax
Sec.
Sec.
Sec. Sec. 6653
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(1)(A)
6653(a)(1)(B)
(a)(2)
6661
1984
$ 64,333
$ 3,216.63
-- --
[1]
$ 16,083
1985
10,333
516.65
-- --
[1]
2,583
1987
36,544
-- $ 1,827.20
[1]
--
9,136
1988
3,940
-- -- --
--
-- All section references are to the Internal Revenue Code in effect for the years remaining in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. After concessions by petitioners, [1] the remaining issues are: (1) Whether in 1987 petitioners have a taxable gain of $ 38,169 from a foreclosure sale of property owned by Mr. Cox. We hold that they do. *189 (2) Whether petitioners have shown that, as a result of a credit of the foreclosure proceeds from Mr. Cox's property to debts of his corporation, petitioners are entitled to a bad debt deduction for 1987. We hold that they have not. (3) Whether in 1987 petitioners are entitled to a business bad debt deduction in the amount of $ 59,198. We hold that they are not. (4) Whether petitioners are liable for the additions to tax under section 6653(a)(1) and (2) for 1984 and 1985, section 6653(a)(1)(A) and (B) for 1987, and section 6661 for each of those years. We hold that they are to the extent described herein. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by reference. Petitioners resided in Paige, Texas, when the petition was filed. Mr. Cox started working for Texas Lightbulb Supply Co., Inc. (the corporation), in August 1972. [2] From then through 1987, his source of personal income was almost exclusively from his employment with the corporation. During 1987, Mr. Cox was the sole shareholder of the corporation. At some point during the period 1972 through 1987, Mr. Cox loaned *190 a total of $ 100,000 to the corporation. The corporation's 1987 yearend financial statements indicate that there was a note payable to Mr. Cox of $ 59,198. A promissory note dated May 15, 1987, in the amount of $ 977,500 and maturing August 3, 1987, payable to MBank Round Rock (MBank) and identifying the corporation as borrower was signed with Mr. Cox's name as president of the corporation and individually. A second note payable to MBank, dated May 31, 1987, in the amount of $ 247,248.14, also matured August 3, 1987, identified the corporation as borrower, and was signed in the same manner as the May 15, 1987, note. Each of the notes payable to MBank was a renewal of a prior note. A third note (the first lien note) dated June 8, 1987, in the principal amount of $ 342,000, this one payable to Frontier National Bank (Frontier), was signed in petitioners' *191 names as makers. This note provided for monthly payments of principal and interest beginning July 28, 1987, with all unpaid amounts due June 8, 1989. The first lien note and each of the above-described notes payable to MBank provide that Texas law is applicable. A deed of trust (the Frontier deed of trust) dated June 8, 1987, covering certain property (the property) owned by Mr. Cox and securing payment of the first lien note was executed by petitioners and recorded. The property included a building leased by Mr. Cox to the corporation. Mr. Cox executed a second deed of trust covering the property (the MBank deed of trust), also dated June 8, 1987, to secure payment of all notes owed to MBank by the corporation and him. The MBank deed of trust was recorded after, and expressly provided that the lien created was secondary and inferior to that of, the Frontier deed of trust. On September 16, 1987, MBank filed in State court a petition and application for appointment of a receiver against the corporation and Mr. Cox. MBank's petition alleged that (1) there were defaults by the defendants in the payment of their promissory notes to MBank with outstanding principal amounts totaling *192 $ 1,161,280.54, plus interest, (2) the corporation was losing at least $ 20,000 per month, and (3) Mr. Cox made misrepresentations regarding the corporation's business status and, if left in control, would deplete its inventory, in which MBank had a security interest. On September 25, 1987, the corporation and Mr. Cox filed a petition for damages and injunctive relief (the State court case) against MBank in the same court. In this petition, they alleged tort violations, fraud, breach of contract, and a violation of trust and confidence by MBank. [3]
*193 On October 15, 1987, the corporation filed a voluntary petition under chapter 11 of the Bankruptcy Code, 11 U.S.C. (the bankruptcy petition), in the United States Bankruptcy Court for the Western District of Texas. The statement of all liabilities of debtor attached to the bankruptcy petition includes a secured trade debt in the amount of $ 1,100,000 owed MBank, but no debt to Mr. Cox. On October 15, 1987, the corporation owed Mr. Cox $ 59,198. Eric Borsheim, the attorney who handled the chapter 11 proceedings relating to the corporation, testified in this Court that in the fall of 1987 it looked "pretty hopeless" that the corporation "would pay any sort of significant dividend [4] to its creditors"; he advised petitioners not to waste their time filing a proof of claim for the $ 59,198; and the corporation was "hopelessly insolvent". Mr. Borsheim testified further: This was a case that was never going to pay 100 percent to the unsecured creditors in the case; never. And as such, the only way the Coxes were ever going to keep this corporation was to convince the creditors in the case to vote for the payment of a dividend that was going to be substantially less than 100 cents *194 on the dollar. It was going to be perhaps ten or 20 cents on the dollar, at the most. And under those circumstances, the debtor can never, with a straight face, say, Well, creditor I am going to only pay you 20 cents on the dollar and, by the way, I want to keep my company and I want to pay me 20 cents on the dollar. That will never work in the real-day world. That claim is worthless on the day that they filed bankruptcy. On December 1, 1987, there was a foreclosure sale of the property, and MBank bid $ 490,000 as buyer. A recorded substitute trustee's deed dated December 1, 1987, indicates that ownership of the property was conveyed to MBank. An internal record of MBank entitled "Managed *195 Assets Changes Memorandum" dated December 9, 1987, indicates that the foreclosure resulted in a "Payoff [of Frontier's] 1st Lien $ 342,888.47." MBank drew a cashier's check dated December 11, 1987, payable to Frontier in the amount of $ 342,888.47, with the notation "Payoff First Lien MBRR/Ref. Richard Cox Texas Light Bulb Supply Company, Inc." The first lien note was endorsed "Pay to the order of [MBank] without recourse" by the executive vice president of Frontier on December 11, 1987. The record here includes a copy of a release of lien effective December 31, 1988, and notarized March 22, 1989, [5] relating to the first lien note, which states that the holder of the note, MBank, releases the property from the lien but "reserves its rights against any and all parties for payment of the note and performance of the other obligations therein." *196 At the time of the foreclosure, Mr. Cox's adjusted basis in the property was $ 451,831. By March 28, 1989, the Office of the Comptroller of the Currency had declared MBank insolvent, placed it in receivership, and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. The FDIC filed a notice of removal of the State court case with the District Court for the Western District of Texas and a motion to dismiss the claims of Mr. Cox and the corporation for failure to state a claim upon which relief could be granted, alleging that MBank's agreement, if any, regarding the tax refund was an oral agreement and did not bind the FDIC. Pleadings and an affidavit filed with the bankruptcy court indicate that, in 1988 and 1989, the successor bank [6] agreed with Mr. Cox and the corporation to take most of the corporation's inventory and cash and reduce its claim to an unsecured claim to the corporation's property in the amount of $ 500,000. The record includes an unsigned copy of an abstract of judgment in favor of the successor bank, as assignee of FDIC, indicating that, on July 25, 1989, a judgment was recovered against Mr. Cox in the amount of $ 520,000. *197 On May 24, 1990, the corporation filed a proposed second amended plan of reorganization, under which the successor bank would release the abstract judgment against Mr. Cox with the bankruptcy court. An order confirming the corporation's second amended plan of reorganization [7] was entered by the bankruptcy court in July 1990. On November 8, 1990, the United States Magistrate in the District Court case recommended granting the FDIC's motion to dismiss the claims of the corporation and Mr. Cox. A judgment to that effect was entered by the District Court on November 30, 1990. Petitioners' income tax return for 1987, which was prepared by an accountant, included Form 4797, Gains and Losses From Sales or Exchanges of Assets Used in a Trade or Business and Involuntary Conversions, reflecting the following regarding the property: Gross sales price
$ 490,000
Cost or other basis plus expense of sale
515,707
Depreciation * * * allowed (or allowable)
63,876
Adjusted basis
451,831
Total gain
38,169
*198 Petitioners conceded that, in 1987, they received $ 18,824 in rental income which was unreported on their return (see supra note 1). On Form 1040X, Amended U.S. Individual Income Tax Return for 1987, prepared by a second accountant, [8] petitioners reflected a gross sales price of $ 700,000 and total gain of $ 248,169 relating to the property, and deduction of business bad debts totaling $ 409,198: 1. DATES OF LOANS:
06/30/87
59,198
12/01/87
[9] 350,000
*199 On second and third Forms 1040X for 1987, also prepared by the second accountant, petitioners reflected a loss in the amount of $ 409,198 and no gain relating to the property, including the following statement: Income previously included gain related to the reposession of a building in the amount of $ 248,169. Taxpayers contend this repossession was unlawful and litigation has been undertaken by both the taxpayer and the lender. Accordingly, the amount of income or loss, if any, has not been determined in 1987 and there should be no gain recognition in that year. Mr. Cox testified that he relied on his second accountant to file his returns. Mr. Corn testified that the original return was "incorrect in reporting the foreclosure proceeds as taxable income" to petitioners because Mr. Cox no longer owned the property, and there was no indication that the foreclosure proceeds had been applied to Mr. Cox's debt, at least until confirmation of the chapter 11 plan, inasmuch as Mr. Cox was still negotiating with the successor bank. The parties stipulated that petitioners' second accountant would testify to the same effect. The record includes a copy of a Form 1099-A, Information *200 Return for Acquisition or Abandonment of Secured Property for 1987, relating to the property, reflecting MBank as the lender, the corporation as the borrower, "12/01/87" as the date of lender's acquisition or knowledge of abandonment, $ 1,565,081.28 as the amount of the debt outstanding, $ -0- as the amount of debt satisfied, and $ 490,000 as the fair market value of the property at acquisition or abandonment. The record also includes a copy of a Form 1099-A, Information Return for Acquisition or Abandonment of Secured Property for 1987, relating to the property, reflecting MBank as the lender, Mr. Cox as the borrower, "12-1-87" as the date of lender's acquisition or knowledge of abandonment, $ 490,000 as the gross foreclosure proceeds, and that the borrower was personally liable for repayment of the debt, but no amounts are stated under balance of principal outstanding or appraisal value of the property. In the notice of deficiency, the Internal Revenue Service (1) disallowed the $ 409,198 loss ultimately claimed on petitioners' Forms 1040X and (2) determined a gain of $ 38,169 as "realized on the repossession" of the property. In their petition, petitioners allege that the determinations *201 relating to repossession of the property were erroneous for the following reason: In 1987 a lender took possession of a business building owned by the Petitioners by a foreclosure of a lien which the lender held. The lender bid in the property at foreclosure, yet the lender did not give the Petitioners credit on their debts to the lender in 1987 as a result of the lender's seizure of the property. The lender has never delivered to the Petitioners a Form 1099 for the Petitioners with respect to the foreclosure. The Petitioners had engaged an attorney who had filed suit on their behalf to seek compensation for various business torts by the lender. The foreclosure was one of the controversies in this suit. Subsequently the lender was closed by Federal regulators and the resulting estoppel of claims against the successor in interest prevented a trial. The only substantial economic effect in 1987 is the loss of the Petitioners' property. OPINION Foreclosure
Petitioners contend that Mr. Cox did not receive "absolute credit" for the foreclosure sale of his property because there was no indication (1) that he was not still liable to MBank for the $ 342,888.47 paid Frontier *202 or (2) that the foreclosure bid was credited toward the notes due MBank until after 1987 (when MBank, the corporation, and Mr. Cox settled their claims and MBank and the successor bank agreed to the second amended plan of reorganization). Alternatively, petitioners argue that, to the extent that the foreclosure proceeds were credited to the corporation's debts, which Mr. Cox guaranteed, petitioners are entitled to deductions for business bad debts. Petitioners suggest that they should bear a lesser burden of persuasion because they must prove a negative, i.e., that they do not have income and the notice of deficiency "could almost be viewed in retrospect as arbitrary and excessive." Respondent contends that petitioners have failed to establish that (1) they did not have a $ 38,169 gain resulting from the foreclosure on Mr. Cox's property considering the bid price of $ 490,000 and his adjusted basis of $ 451,831, and (2) that they are entitled to the $ 350,000 loss claimed on the amended returns, the computation of which was not explained, on the transaction. In the reply brief, respondent argues that (1) the settlement relating to the corporation's chapter 11 proceedings was irrelevant *203 to the foreclosure, (2) petitioners did not raise in the pleadings the argument that they are entitled to a bad debt deduction to the extent the foreclosure proceeds were credited to the corporation's debts, and (3) petitioners did not raise an affirmative defense in the pleadings that the burden of persuasion should be shifted because the notice of deficiency is arbitrary. In their reply brief, petitioners assert that the foreclosure proceedings did not result in a sale of the property because it was not court ordered and that there was no gain realization event or economic benefit to petitioners. We agree with respondent. Despite petitioners' attempt to obfuscate the issue with arguments relating to the corporation's claims against MBank, the chapter 11 proceedings of the corporation, and the failure of MBank, the essential facts are that, in 1987, the property was disposed of in a foreclosure sale for a bid of $ 490,000, at which time Mr. Cox's adjusted basis was $ 451,831. Petitioners failed to show that Mr. Cox did not recognize $ 38,169 of gain on this transaction. It is well settled that a foreclosure sale, including a nonjudicial foreclosure, is a "sale or exchange" for *204 purposes of Federal income taxation. Chilingirian v. Commissioner, 918 F.2d 1251 (6th Cir. 1990), affg. T.C. Memo. 1986-463; see also Helvering v. Hammel, 311 U.S. 504 (1941). Section 1001(a) provides that the gain or loss from the sale or other disposition of property shall be the difference between the amount realized and the adjusted basis of the property. In general, the amount realized from the sale includes the amount of liabilities from which the transferor is discharged as a result of the sale. Sec. 1.1001-2(a)(1), Income Tax Regs.Section 1.1001-2(a)(4)(ii), Income Tax Regs., provides that the sale of property that secures a recourse liability discharges the transferor if another person agrees to pay the liability, even if the transferor is not in fact released from the liability. In 1987, there was a foreclosure sale of the property owned by Mr. Cox for $ 490,000, at which time his basis was $ 451,831. Under Texas law, he was entitled to a credit of at least the $ 490,000 foreclosure bid [10] toward his debts. See Resolution Trust Corp. v. Westridge Court, 815 S.W.2d 327, 330 (Tex. Ct. App. 1991); *205 Hayner v. Chittim, 228 S.W. 279, 281 (Tex. Civ. App. 1921). As respondent points out on brief, there is nothing in the record here to show that, in the State court case, Mr. Cox attacked the validity of the foreclosure sale or that he tried to set it aside or alleged a right of redemption to the property. See Scott v. Schneider Estate Trust, 783 S.W.2d 26, 28 (Tex. Ct. App. 1990); Rogers v. Fielder, 392 S.W.2d 797, 798 (Tex. Civ. App. 1965); see also Hawkins v. Commissioner, 34 B.T.A. 918 (1936), affd. 91 F.2d 354 (5th Cir. 1937). Although the petition in the State court case alleged that the notes to MBank were obtained "wrongfully and with deceit" and asked the court to restrain MBank from foreclosing on the deeds of trust (see supra note 3), petitioners did not introduce evidence here as to the court's resolution of these claims (other than the ultimate dismissal) or even their validity. Mr. Corn, the accountant, who negotiated and supervised negotiations relating to claims and the plan of reorganization in the chapter 11 *206 proceedings of the corporation, testified that MBank would not credit the $ 490,000 foreclosure proceeds except in connection with a comprehensive resolution of all claims. However, Mr. Corn's testimony suggests that this was a voluntary course of action by Mr. Cox on behalf of the corporation, intended to preserve his business by facilitating MBank's settlement and agreement with the plan of reorganization. More importantly, the credit of the $ 490,000 foreclosure proceeds to Mr. Cox's debts was not legally tied to the chapter 11 proceedings of the corporation, a debtor separate from Mr. Cox. Mr. Cox was legally entitled to the credit of at least the $ 490,000 amount of the bid in 1987. Indeed, on brief, petitioners concede that the second deed of trust provides for a credit of the foreclosure proceeds to reduce the debt secured by the deed of trust. Petitioners did not present any evidence to prove that Mr. Cox asked that the $ 490,000 be credited toward his debts in the State court case, or that the court rejected his request or did not act on his request until after 1987. Under these circumstances, we conclude that petitioners are taxable in 1987 on $ 38,169 in gain ($ 490,000 *207 foreclosure bid less $ 451,831 adjusted basis) from the foreclosure sale of the property. Petitioners' primary contention regarding this issue appears to be that there was no discharge of Mr. Cox's liability or credit to his debt on the foreclosure of the property, but MBank and the successor bank forced this to be "entwined" with the corporation's chapter 11 proceedings and resolution of the claims of the corporation, Mr. Cox, and MBank. Their argument suggests that the 1987 foreclosure was not the appropriate point in time for recognizing gain or loss, but they fail to point to any event which triggered gain or loss, for example, when the successor bank reduced its claim in 1989, or when the order confirming the corporation's second amended plan of reorganization was entered in 1990. Although *208 Mr. Corn testified that MBank failed to acknowledge a credit to Mr. Cox in order to improve its negotiating position in the chapter 11 proceedings of the corporation and the documents stipulated as exhibits are unclear as to the extent to which Mr. Cox was credited, which debts were credited, and when the debts were credited, the fact remains that the foreclosure sale occurred in 1987, and, under the terms of the deed of trust and Texas law, Mr. Cox was entitled to a credit of the foreclosure proceeds toward his obligations as of that time. Petitioners have not cited any authority under Texas law or of this Court that supports their argument. The only cases we have found are inapposite to the situation here. In R. O'Dell & Sons Co. v. Commissioner, 8 T.C. 1165 (1947), affd. 169 F.2d 247 (3d Cir. 1948), mortgaged property was sold in foreclosure for a minimum bid price. Under State law, the mortgagee had the right to seek a deficiency judgment during a 3-month period which extended into the taxable year following the foreclosure sale, and, if the mortgagee did so, the mortgagor had a limited right to redeem the property. *209 In affirming our opinion, the Court of Appeals concluded that, under State law, "the transaction of foreclosure and sale * * * [was not] completed, until" the later year when the right of redemption expired. 169 F.2d at 249. Thus, the issue in R. O'Dell & Sons Co. v. Commissioner, supra, was whether the taxpayer would be treated as realizing an amount greater than the bid price as a result of the foreclosure, and whether the property would be redeemed. In contrast, the foreclosure sale of the property here was not for a minimal bid, which necessitated waiting to see whether a deficiency judgment for the amount of the debt was obtained in order to determine if there was gain. The foreclosure sale here resulted in a $ 490,000 bid, an amount in excess of Mr. Cox's $ 451,831 adjusted basis in the property so that gain was determinable to that extent on foreclosure. Respondent does not contend that petitioners realized income in excess of the bid price. Moreover, petitioners have not cited nor have we found a statutory structure under Texas law comparable to the 3-month period under the State law applicable in R. O'Dell & Sons Co. v. Commissioner, supra. *210 Eisenberg v. Commissioner, 78 T.C. 336 (1982), involved a foreclosure sale of a ship in an in rem proceeding in which the sales proceeds were paid into court to be used to satisfy claims of a group of creditors, including some which were not creditors of the taxpayer but instead had claims arising from the operation of the ship by the taxpayer's corporation. The foreclosure proceeds were deposited into court in December 1977 but not distributed to the creditors until 1978. The $ 490,000 proceeds from the foreclosure sale here were not paid into a court but were in the control of Mr. Cox's creditor, MBank, which paid Frontier, the only other creditor with a deed of trust as to the property, in 1987 shortly after the foreclosure sale. Petitioners have not shown that the proceeds were claimed by anyone who was a creditor only of the corporation and not of Mr. Cox, as in Eisenberg v. Commissioner, supra.Both Mr. Cox and the corporation were indebted to MBank, which had control over the proceeds. Gain from the foreclosure was determinable in 1987. The facts here are not akin to those in Eisenberg v. Commissioner, supra. *211 Petitioners' contention that the foreclosure sale here does not constitute a sale for purposes of gain recognition under section 1001(a) because it was not court ordered is contrary to Chilingirian v. Commissioner, 918 F.2d 1251 (6th Cir. 1990), affg. T.C. Memo. 1986-463, which concluded that a nonjudicial foreclosure is a "sale or exchange" for Federal tax purposes. In their reply brief, petitioners argue further that they did not receive any income under a claim of right, free of restrictions, and, even if they did, there were restrictions on their economic use of the income. Under the deed of trust and Texas law, Mr. Cox had the right to have the foreclosure proceeds credited to his debts. We need not decide whether this is a "claim of right" situation because petitioners have not shown us a legal restriction on Mr. Cox's right to have the proceeds credited. The cases cited by petitioners [11] in support of this argument have no bearing on the situation here. *212 Rev. Rul. 55-142, 1955-1 C.B. 339, which is also cited by petitioners, is totally inapposite. It provides that no taxable gain results when the owner of separate contiguous parcels of land consolidates them as a single parcel by conveying them to a nominee which immediately reconveys them to the owner, without any consideration for the transfers. Obviously, after the foreclosure, Mr. Cox no longer owned the property and was entitled to a credit of at least $ 490,000 to his debts. Petitioners have raised a plethora of other similar arguments to the effect that the foreclosure does not result in taxable gain to Mr. Cox, which we have considered and concluded are meritless. We reject petitioners' arguments regarding the burden of persuasion in this case. We note that they did not plead that the burden should be shifted to respondent. See Rules 39, 142(a). Moreover, under any of the various standards suggested in their rambling discourse on this point, the record indicates that the property was sold for $ 490,000 in 1987. Under the deed of trust and Texas law, Mr. Cox was entitled to a credit of at least that amount, and respondent does *213 not contend that the credit, and amount realized, were greater. Bad Debt Deduction Relating to Foreclosure
Alternatively, petitioners contend that they are entitled to a bad debt deduction to the extent the foreclosure proceeds from the property, which belonged to Mr. Cox, were credited to the corporation's debts. This issue was raised for the first time on brief, so that arguably respondent was prevented from presenting evidence on the issue at trial. See DiLeo v. Commissioner, 96 T.C. 858, 891 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Shelby U.S. Distributors, Inc. v. Commissioner, 71 T.C. 874, 885 (1979); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975). However, even if we were to consider this argument, petitioners did not show that Mr. Cox treated the crediting of the proceeds as a debt from the corporation to him (such as by appropriate entries in the financial statements). Thus, to the extent that the foreclosure proceeds were credited to the debts of the corporation, the analysis below regarding the $ 59,198 petitioners contend was a business *214 bad debt applies. They have not established that any claim by Mr. Cox, as guarantor or otherwise, to recover the amount credited from the proceeds to the debts of the corporation became worthless in 1987. Other Bad Debt Deduction
Petitioners contend that the $ 59,198 amount outstanding from the corporation to Mr. Cox was a business bad debt which became uncollectible or worthless even had he filed a proof of claim in the chapter 11 proceedings of the corporation. Respondent argues that petitioners have not shown the worthlessness of the amount, but instead "voluntarily chose not to file a claim" in the chapter 11 proceedings. We agree with respondent that petitioners have not shown worthlessness of the $ 59,198 in 1987. In general, section 166(a) allows a deduction for any debt which becomes worthless within the taxable year. The $ 59,198 was reflected on the 1987 financial statement of the corporation as a note payable to Mr. Cox. Mr. Borsheim's testimony indicates that Mr. Cox opted not to file a proof of claim in the chapter 11 proceedings of the corporation because it was necessary to convince the other creditors to confirm the plan of reorganization for the corporation. *215 Although it was a difficult choice, Mr. Cox did not pursue collection in order to preserve his business, thereby converting the $ 59,198 to a contribution to capital. Petitioners have not shown us "the identifiable event" causing the amount to became worthless in 1987. See Estate of Mann v. United States, 731 F.2d 267, 275-276 (5th Cir. 1984); Hubble v. Commissioner, T.C. Memo. 1981-625. Nor have petitioners demonstrated, nor even argued, that the $ 59,198 amount became partially worthless in 1987. See section 166(a)(2). Additions to Tax
In their reply brief, petitioners contend that the additions to tax under section 6653(a)(1) and (2) for 1984 and 1985, section 6653(a)(1)(A) and (B) for 1987, and section 6661 for each of the years in issue should not apply because (1) they relied on their second accountant's advice relating to the positions as to the foreclosure and the bad debt, and (2) they "reasonably believed" that the receipt of the amount determined by respondent to be rental income (which they conceded [12] (see supra note 1)) was not taxable. *216 Respondent argues that petitioners have failed to show that the additions to tax do not apply. We agree with respondent to the extent that petitioners have not shown that they were not negligent or that they had substantial authority for the position relating to the unreported rental income. Section 6653(a)(1) for 1984 and 1985 and section 6653(a)(1)(A) for 1987 provide for an addition to tax of 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) for 1984 and 1985 and section 6653(a)(1)(B) for 1987 impose a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or the failure to do what a prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of establishing that the negligence additions to tax do not apply. Petitioners' witness, Charles Matthews, testified that he was paying amounts to continue to live on certain property sold by him to Mr. Cox (the second property). *217 Mr. Cox testified that the payments were made to him. Respondent's agent testified that, in connection with his examination, he found bank deposits in 1987 totaling about $ 18,000, the deposit slips as to which bore the notation "Rent from Bastrop property" (the second property), and Mr. Matthews told him that these were "rental for living on the property." On brief, petitioners conceded that this was unreported income. They never explained their position for not reporting this in their 1987 return or whether information regarding this item was provided to their accountants. They have not demonstrated that they were not negligent with regard to the $ 18,824 in rental income. Their argument that they reasonably believed that this was not taxable is not sufficiently supported by the record. However, for purposes of section 6653(a)(2) for 1984 and 1985 and section 6653(a)(1)(B) for 1987, we are convinced that they relied on the advice of competent and experienced accountants who were supplied with all the necessary information relating to the foreclosure and bad debt issues. To the extent that the underpayments are attributable to these issues, they are not attributable to petitioners' *218 negligence. See Weis v. Commissioner, 94 T.C. 473, 487 (1990); Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Mr. Corn and, by the parties' stipulation, Mr. Cox's second accountant, who prepared the amended returns, testified that they were fully aware of the circumstances involved in the foreclosure, the bad debt, and the chapter 11 proceedings of the corporation. Section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Under section 6661(b)(1)(A), for individual taxpayers a substantial understatement must exceed the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. The amount of the understatement is reduced by the portion of the understatement attributable to the tax treatment of any item if there was substantial authority for the return position regarding the item or adequate disclosure of the relevant facts [13] affecting treatment of the item in the return or a statement attached to it. Sec. 6661(b)(2)(B). Substantial authority is less stringent than a "more likely than not" standard *219 (i.e., a greater than 50 percent likelihood of prevailing in litigation), but stricter than a reasonable basis standard applicable under section 6653(a). Sec. 1.6661-3(a)(2), Income Tax Regs. In general, substantial authority includes court cases. Sec. 1.6661-3(b)(2), Income Tax Regs.
Under section 6661(c), the Secretary has authority to waive all or part of the section 6661 addition to tax on showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. The taxpayer may make such a showing if there is reliance on a tax professional, which was reasonable, and the taxpayer acted in good faith. Sec. 1.6661-6(b), Income Tax Regs.
Under the circumstances here, we conclude that the section 6661 addition to tax does not apply to the portions of understatements *220 of income tax attributable to the positions relating to the foreclosure and the bad debt issues. However, petitioners have not articulated their position or the authority, if any, for not including the $ 18,824 in taxable income in 1987. There is no evidence that they relied on an accountant in reaching their position. Our conclusions regarding the additions to tax necessitate a Rule 155 computation. The addition to tax under section 6661 is sustained, provided that the Rule 155 computation reflects an understatement of tax attributable to this item which is substantial under section 6661(b)(1)(A). See DiPlacido v. Commissioner, T.C. Memo. 1993-169. To reflect the parties' concessions and the foregoing, Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the portion of the underpayment attributable to negligence, which respondent determined to be the full deficiency amounts.↩
1. In the petition petitioners conceded the deficiency for 1988 and on brief conceded an adjustment in the amount of $ 18,824 for unreported rental income for 1987. The deficiencies for 1984 and 1985 result from a net operating loss carryback from 1987. Respondent also made miscellaneous computational adjustments (medical and dental expense deductions and child care credits, political contribution credits, and general business credits), which result from the primary adjustments.↩
2. Pleadings filed on behalf of Mr. Cox and the corporation in State court indicate that, until 1976, the corporation was operated as an unincorporated entity.↩
3. More specifically, in the petition in the State court case, the corporation and Mr. Cox alleged such breach of contract and tort violations by MBank in (1) preventing Mr. Cox from refinancing the property and thereby preventing him from pursuing a business opportunity, (2) claiming $ 200,000 of the corporation's tax refund, instead of $ 100,000 as allegedly agreed, (3) refusing to extend the promissory notes and wrongfully seizing about $ 117,000 deposited by the corporation with MBank and applying it as an offset to the amount due on the notes, which resulted in MBank's failure to honor the corporation's checks, (4) inducing the corporation's management to enter into notes "wrongfully and with deceit," and (5) attempting to close the corporation and assume management of it. In the prayer for relief, they sought damages, the return of the $ 117,000 seized, injunctive relief restraining MBank from foreclosing on "various Security Agreements and/or Deeds of Trust", and attorney's fees and court costs.↩
4. Mr. Borsheim appears to be referring to distributions from the bankruptcy estate (see, e.g., 11 U.S.C. secs. 1143, 1326 (1988)). The term "dividend" appears in rules 3009 and 3010 of the Bankruptcy Rules↩, 11 U.S.C. app. at 251 (1988), which apply to ch. 7 liquidation and ch. 13 cases.
5. There is no court clerk file-mark on the copy of the release of lien. This release may not have been filed, for Frontier filed a release of lien against the property on May 30, 1991.↩
6. Mark Dietz, the attorney who represented all of the banking entities in the litigation involving the corporation and Mr. Cox, testified that the successor bank, which was Deposit Insurance Bridge Bank, was "created at the time [MBank] failed in March of 1989", and, thereafter, it was acquired by Bank One. The successor bank entities are referred to herein as the successor bank.↩
7. There is no evidence of the payments received by the various classes of creditors under the second amended plan of reorganization.↩
8. The second accountant worked in the same accounting firm and under the supervision of Harvey Corn, who negotiated and supervised negotiations relating to claims and the plan of reorganization in the ch. 11 proceedings of the corporation. In 1987, Mr. Corn was a tax partner in Coopers & Lybrand with about 4 years' experience regarding accounting and financial matters relating to bankruptcies. Mr. Corn testified in this case to matters regarding the negotiations and the preparation and positions taken on the Forms 1040X filed. The parties stipulated that the second accountant would testify to the same effect as Mr. Corn.↩
9. Although the amended return does not identify which loans are referred to, it is apparent from the proceedings in this case that the $ 59,198 amount represents the loan from Mr. Cox to his corporation, and the $ 350,000 amount relates to the alleged credit from the foreclosure of Mr. Cox's property to his corporation's debts.↩
10. Mr. Cox was entitled to have the reasonable market value of the property credited on his debts. See Resolution Trust Corp. v. Westridge Court, 815 S.W.2d 327, 330↩ (Tex. Ct. App. 1991).
11. See North American Oil Consolidated v. Burnet, 286 U.S. 417 (1932) (profits earned on oil land placed in receivership pending legal action over its beneficial ownership were taxable to one of the claimants upon his receipt of the profits pursuant to a District Court's order, even though the order might be reversed on appeal); All Americas Trading Corp. v. Commissioner, 29 T.C. 908↩ (1958) (kickback payments from corporate suppliers to corporate president-minority shareholder were not taxable to the corporation during the years in issue where shareholder received the payments under claim of right).
12. Although the deficiency notice and respondent's requested findings of fact refer to the amount of rental income as $ 18,824, elsewhere on brief the parties refer to the amount as $ 18,829. We conclude that the correct amount is $ 18,824.↩
13. In lieu of disclosure of the facts affecting the tax treatment of the item, the taxpayer may set forth a description of the legal issue presented by the facts. Sec. 1.6661-4(b)(2), Income Tax Regs.↩