T.C. Memo. 1995-583

UNITED STATES TAX COURT

HAROLD T. AND CHRISTINE B. COUCH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22110-93.                    Filed December 6, 1995.

<u>Joseph D. Anroman</u>, for petitioners.

<u>Carmino J. Santaniello</u>, for respondent.


MEMORANDUM OPINION

RAUM, <u>Judge</u>:  The Commissioner determined a $10,962

deficiency in petitioners' 1990 income tax plus a section

6662(a)[1] penalty in the amount of $2,192.  The issues for

_____

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue.  All
Rule references are to the Tax Court Rules of Practice and
Procedure.

decision are: (1) Whether a deduction claimed by petitioners as a business bad debt became worthless in 1990, and (2) whether the debt involved qualifies as a "business" bad debt under section 166.[2] The case was submitted on the basis of a stipulation and two supplemental stipulations of fact.

Petitioners Harold and Christine Couch (Dr. and Mrs. Couch) resided in Simsbury, Connecticut, at the time they filed their petition in this case. From 1969 until August 1984, Dr. Couch, a Ph.D. research scientist, was employed by United Technologies Corporation (UTC). In 1978, Dr. Couch began supervising efforts to reduce the Titanium Diboride coating process ("coating process") to commercial practice. Titanium Diboride (TiD2) is an extremely hard metal which can be electroplated on a number of surfaces. An employee of Hamilton Standard, a Division of UTC, had invented the coating process in 1970. Sometime in 1971, that employee transferred to the United Technologies Research Center to reduce the process to commercial practice. UTC terminated its efforts to reduce the coating process to commercial practice in 1982.

When Dr. Couch left UTC's employ in August 1984, he believed that substantial commercial and military applications for the coating process existed and that the process could be reduced to

_____

[2] The Commissioner has conceded in a supplemental stipulation that petitioners are not liable for the penalty. Also, concessions by the parties have removed other issues from this case. See infra note 5.

commercial applications utilizing advanced electron microprobing techniques as an analytical tool. In August 1984, petitioners incorporated HTC Industries, Inc. (HTC) in Connecticut, and, as HTC's board of directors, adopted a resolution for the issuance of "Section 1244 Stock", as defined in the Internal Revenue Code.[3] All stock issued by HTC qualifies as section 1244 stock.

Dr. and Mrs. Couch were HTC's president and secretary/treasurer, respectively. In October 1984, they acquired for cash 60 percent and 40 percent, respectively, of HTC's issued and outstanding common stock.[4] At the same time they also loaned HTC $49,500 from their personal savings to use as start-up capital. The loan was evidenced by a promissory note bearing interest at 12 percent per annum.

On August 30, 1984, HTC had submitted a proposal to the Department of the Army regarding a possible contract involving Titanium Diboride research. During a pre-award qualification audit in September 1984, the Defense Contracting Administrative Services Management Agency informed HTC that it would have to obtain a $20,000 line of credit as a condition of any contract

---

[3] Pursuant to sec. 1244, "a loss on section 1244 stock" which would otherwise be treated as a loss from the sale or exchange of a capital asset is treated as an ordinary loss, subject to various conditions apparently not applicable here, except that in the case of a husband and wife filing a joint return the amount allowable may not exceed $100,000.

[4] HTC's address shown on 4 of its 5 returns in evidence, from its first through its final return, appears to be the same as petitioners' home address.

award.  After the audit, petitioners approached a number of local lending institutions for the purpose of obtaining a line of credit on behalf of HTC.  However, on each occasion, they were informed that such financing of a small, start-up company was not possible.

In October 1984, petitioners obtained a personal line of credit from Society for Savings secured by a second mortgage on their residence.  They personally guaranteed the $20,000 credit line to HTC contingent upon the contract being awarded to HTC.  In March 1985, the Army awarded a Cost Plus Fixed Fee Contract ("the Contract") to HTC.  HTC began work under the Contract on April 1, 1985.  On April 12, 1988, the Army terminated the Contract.

Between August 1984 and September 1989, petitioners made loans to HTC in the total amount of $187,143.86.  During this period and through March 31, 1990, HTC made principal payments on its indebtedness to petitioners in the total amount of $97,757.36.  As of March 31, 1990, petitioners computed interest outstanding on the unpaid loans to HTC in the amount of $62,480.31.

HTC sought the balance of the unpaid loans and interest from the contracting officer of the Army.  The contracting officer offered a settlement proposal for $6,107.47, the difference between the contract amount ($248,962) and the amount HTC had previously been paid.  However, he denied their claim for

equitable adjustment of the contract price. On June 19, 1990, HTC was dissolved by the State of Connecticut. The Couchs were given standing to pursue an appeal before the Armed Services Board of Contract Appeals on behalf of HTC. They timely filed an appeal that was denied by the Board in an opinion dated October 30, 1992. However, the Board ordered that the parties were to negotiate an equitable distribution of the property owned by HTC.

The Couchs caused HTC to appeal the Board's decision to the United States Court of Appeals for the Federal Circuit. Extensive briefs were filed on the appellant's behalf, dated July 30, 1993, and September 30, 1993. A divided panel of the Court of Appeals affirmed the Board's decision on March 7, 1994. Thereafter the appellant filed with the Court of Appeals a "Combined Petition for Rehearing and Suggestion for Rehearing in Banc", which was denied. The Couchs on behalf of HTC then sought review by the Supreme Court, but their petition for certiorari was denied on October 3, 1994. Finally, in accord with the order of the Armed Services Board of Contract Appeals, petitioners' counsel by letter of January 15, 1995, took steps to begin negotiations with the Army on the "quantum as to the two outstanding issues on which the Board of Contract Appeals ruled for HTC." The record does not disclose whether such negotiations have in fact been commenced, or whether, if commenced, they have been concluded, or, if concluded, the results thereof.

On Schedule C, Profit or Loss From Business, of their 1990 return, petitioners claimed a business bad debt deduction in the amount of $100,000. This $100,000 represents a portion of the unpaid loans made to HTC. The Commissioner's determination of deficiency in the amount of $10,962 is based primarily upon the disallowance of this $100,000 bad debt deduction claimed by petitioners.[5]

At the calendar call of this case the parties orally stipulated that the debts of HTC amounted to $133,000 at the end of 1990, and that none of that amount had ever been repaid to petitioners. However, that oral stipulation fails to specify how much of the $133,000 consists of unpaid interest.[6]

Section 166(a) allows "as a deduction any debt which becomes worthless within the taxable year." Section 1.166-1(c), Income Tax Regs., requires that the debt be a bona fide one. The

---

[5] The Commissioner also disallowed other deductions claimed on Schedules A and C. Petitioners have conceded these other deductions in their opening brief. The Commissioner concedes that petitioners are entitled to a charitable contribution deduction in the amount of $733, which had previously been disallowed.

[6] Since it does not appear that petitioners were other than cash basis taxpayers, any unpaid accrued interest would not have been included in their gross income. Therefore, no deduction would in any event be allowable for a loss based upon unpaid or unrealized income, in accordance with the long established principle that no deduction for a loss is allowable in respect of an item of unrealized income. Hort v. Commissioner, 313 U.S. 28, 32-33 (1941); Hutcheson v. Commissioner, 17 T.C. 14, 19 (1951); Lewicki v. Commissioner, T.C. Memo. 1974-86 (unrealized interest).

Government concedes that the advances made in this case constitute bona fide loans. Section 1.166-2(a), Income Tax Regs., provides that, in determining the worthlessness of the debt, "the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor."

As recognized by the Supreme Court in <u>United States v. S.S. White Dental Manufacturing Co.</u>, 274 U.S. 398, 400-401 (1927), quoting from and relying upon Article 141 of Treasury Regulations 45, the loss "must usually be evidenced by [a] closed and completed" transaction. The Court also quoted with approval Article 151 of those regulations to the effect that a sufficient showing of worthlessness has been made "[w]here all the surrounding and attendant circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment."[7] <u>Id.</u> at 401.

The worthlessness of a debt is a factual question confined to the particulars of each case. <u>Boehm v. Commissioner</u>, 326 U.S. 287, 292-293 (1945); <u>Dustin v. Commissioner</u>, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Although

---

[7] Regulations currently in effect and applicable during the taxable year are substantially identical in all significant respects to the regulations quoted above in <u>United States v. S.S. White Dental Manufacturing Co.</u>, 274 U.S. 398 (1927). Sec. 1.166-2(b), Income Tax Regs.

worthlessness must be determined objectively, not subjectively, and although the taxpayer must exercise business judgment in determining in the first instance whether to take a deduction, he is not required to be an "incorrigible optimist". S.S. White Dental Manufacturing Co., 274 U.S. at 403. The worthlessness of the debt must be determined as of the time the deduction is taken. Estate of Scofield v. Commissioner, 266 F.2d 154, 163 (6th Cir. 1959), affg. in part, revg. in part 25 T.C. 774 (1956). However, subsequent events may be considered to test the soundness of the decision. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 597 (1991).

The taxpayer must demonstrate that the debt had value at the beginning of the year in which the taxpayer claimed worthlessness, and that the debt became worthless in that year. American Offshore, Inc. v. Commissioner, supra at 593; Dustin v. Commissioner, supra at 501. A taxpayer may deduct a bad debt only in the year it in fact becomes worthless. American Offshore, Inc., supra at 594. The opinion in that case sets forth an extensive list of factors that have been considered in determining worthlessness. Id. Factors that are relevant in this case include the value of any collateral securing the debt, the financial condition of the debtor, the bankruptcy or receivership of the debtor, and lack of assets. Id. at 594-595. The taxpayer has the burden of proving the year of worthlessness. Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598 (1981).

In the present case, petitioners contend that the debt became worthless during 1990. They rely first on the fact that HTC was dissolved by the State of Connecticut on June 19, 1990. They equate HTC's dissolution to bankruptcy. They argue that section 1.166-2(c)(2), Income Tax Regs., provides that the year of settlement in bankruptcy cases is the proper year to consider the debt worthless, that the dissolution of their corporation is equivalent to bankruptcy, and that a deduction should therefore be allowed here in the same manner.

Petitioners misread section 1.166-2(c)(2), Income Tax Regs. That section provides:

> In bankruptcy cases a debt _may_ become worthless before settlement in some instances; and in others, only when a settlement in bankruptcy has been reached. In either case, the mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, thereby confirming the conclusion that the debt is worthless, shall not authorize the shifting of the deduction under section 166 to such later year. [Emphasis added.]

_Id._ Petitioners ignore the word "may" in the regulation. They also ignore section 1.166-2(c)(1), Income Tax Regs. That section states that "[b]ankruptcy is _generally_ an indication of worthlessness". _Id._ (Emphasis added). It has been held that bankruptcy "is not enough by itself to establish worthlessness." _Cox v. Commissioner_, 68 F.3d 128, 131 (5th Cir. 1995), affg. T.C. Memo. 1994-189.

Petitioners next point out that the corporation had no property with which to secure the debts. Because the corporation

had been dissolved, they argue, "a judgment against the same would be a legal and factual impossibility."  Petitioners' own actions regarding HTC belie this claim.  In September 1990, after HTC had been dissolved, petitioners filed for personal bankruptcy.  HTC Indus., ASBCA No. 40562, 93-1 B.C.A. (CCH) par. 25,560 affd. on reconsideration, 93-2 B.C.A. (CCH) par. 25,701 (1992).  In their petition for bankruptcy, they listed as "personal property" the litigation "Couch v. Army, ASBCA No. 40562" with a market value of $2,000,000.  Id.  The Bankruptcy Court order was not issued until March 19, 1991.  In July 1991, the Couchs amended their Bankruptcy Petition to read:  "Couch v. Army ASBCA #40562.  Fair market value is unknown.  Property claimed exempt under 11 U.S.C. 522(d)(1) and (5)."  Id.  The Couchs' actions indicate that through July 1991 they believed the claim held by HTC and pursued by them on HTC's behalf had substantial value.  Their actions contradict their claim of worthlessness for 1990.

Subsequent events support the actions of petitioners.  See American Offshore, Inc. v. Commissioner, supra at 597.  In its decision, the Board of Contract Appeals observed that the property of HTC had not been distributed.  Although the Board did not give the property specific value, and even noted that the property may have had no value, the Board ordered the parties to negotiate an equitable distribution of what remained.  The Board's order indicates its belief that, as late as 1992, the

property of HTC still had some value.  This belief, in turn, is evidence that the dissolution of HTC in 1990 was not a "closed and completed" transaction indicating the worthlessness of the loans HTC held.

Petitioners also contend that their unsuccessful attempts to recover the debts through litigation are evidence of the worthlessness of the debts.  HTC submitted a formal claim under the Contract Disputes Act of 1978 for an equitable adjustment in the Contract price in November 1989.  The Army denied the claim in March 1990.  That same month, HTC appealed the Army's denial of its claim to the Armed Services Board of Contract Appeals. The Board rendered a decision in 1992 against petitioners. Petitioners then caused that decision to be appealed to the United States Court of Appeals for the Federal Circuit, and pursued that appeal vigorously and aggressively as evidenced by the extensive briefs filed in that litigation.  And after a divided panel of the Court of Appeals affirmed the Board's decision in an unpublished opinion, HTC Indus., Inc. v. Aspin, Secretary of Defense, 22 F.3d 1103 (Fed. Cir. 1994), petitioners caused HTC to file a petition for rehearing including a suggestion for a rehearing en banc.  The petition for rehearing was denied, and the suggestion for rehearing en banc was apparently not favorably acted upon.  Finally, the Couchs caused HTC to seek further review in the Supreme Court, which denied the

petition for certiorari.  <u>HTC Industries, Inc. v. Perry, Secretary of Defense</u>, 513 U.S. __ (1994).

It is well established that normally if a taxpayer is willing to pursue the claim in court, "there is as a matter of fact sufficient chance of at least part recovery to justify that taxpayer in deferring the claim of a loss deduction * * * until the litigation in question is concluded."  <u>Estate of Scofield v. Commissioner</u>, 266 F.2d 154, 159 (6th Cir. 1959), affg. in part, revg. in part 25 T.C. 774 (1956); see <u>Dawn v. Commissioner</u>, 675 F.2d 1077, 1078 (9th Cir. 1982), affg. T.C. Memo. 1979-479; <u>Gale v. Commissioner</u>, 41 T.C. 269, 276 (1963).

In our judgment petitioners would not have pursued the claim against the Army as vigorously and aggressively as they did unless they believed they could recover something.  That they have not had any success does not objectively negate the value of their claim to them.  In fact, their pursuit of the claim through the Board of Appeals, the Federal Circuit, and even the Supreme Court indicates their belief, at least as late as 1994, that they held a valuable asset.

We find that the debt in question did not in fact become worthless in 1990.  In the circumstances, we need not consider whether the loss was a business or nonbusiness bad debt.

Due to concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.
